# Vaughn *et al.* v. The State.

## *Indictment for Murder.*

1. *Homicide; evidence; question of fact for jury.*—Under an indictment for murder where the evidence for the State tends to show that deceased was killed in Barbour county, Alabama, and the body thrown in the Chattahoochee river and that death was produced by choking and cramming a handkerchief in the mouth, and the testimony shows that a body was found in said river several months afterwards with a

[Vaughn *et al.* v. The State.]

handkerchief stuffed in the throat and the witness who discovered the body identified a handkerchief as the one found in the throat of such body, and another witness testified that such handkerchief was similar to some she had washed for one of the defendants prior to the alleged homicide, the identity of the handkerchief is a question of fact for the determination of the jury.

2. *Same; same; declaration in presence of defendant not denied.* In such a case, it is competent for the State to show that on the night the homicide is alleged to have been committed a witness for the State heard another person say in the presence and hearing of one of the defendants "You have been the cause of one man's death, and you think you will be the cause of mine, but I am going to get away," when such defendant does not deny the statement and it is admitted as against such defendant only.

3. *Same; evidence of telephone message where voice is not identified.*—In such case the testimony of a witness for the defense that on the night of the alleged homicide he received a telephone message purporting to come from the deceased, when the witness did not know or recognize the voice, is hearsay and inadmissible.

4. *Same; illegal evidence; right to exclude.*—The court of its own motion at any stage of the trial will exclude illegal evidence.

5. *Same; same; clerical misprision.*—Where the bill of exceptions is in the form of a stenographic report of the testimony and it shows that certain hearsay testimony of a witness for the defense was excluded on motion of the State such testimony having been drawn out after the appearance of the heading "Cross-Examination," but such heading also appears further on in the testimony of said witness, and the excluded testimony would have been beneficial to the defense and detrimental to the State, the first appearance of the words "Cross-Examination" is a clerical error correcting itself and it will be presumed that the excluded testimony was drawn out by the defense rather than the State.

6. *Same; same.*—Where the State offers circumstantial evidence under an indictment for murder tending to show that deceased met his death by choking at the hands of the defendants, evidence in behalf of the defense that certain stains or spots on the floor were not blood stains is irrelevant and properly excluded.

7. *Same; flight; voluntary surrender.*—Where the State does not seek to show flight on the part of the defendants it is incompetent for the defense to show that defendants volun-

[Vaughn *et al.* v. The State.]

tarily surrendered or failed to flee when opportunity was offered.

. *Same; corpus delicti; venue.*—Under an indictment for murder where the State relies upon circumstantial evidence tending to show that deceased was killed in the county where the indictment was found and his body thrown in a river, in which it was discovered, about 156 miles below the scene of the alleged crime some forty-seven days afterwards with marks and bruises corresponding with the testimony of the State's witnesses as to the method of death, the venue of the crime and the *corpus delicti* are questions of fact for the determination of the jury and the refusal of the affirmative charge upon these points is free from error.

. *Same; charge singling out testimony.*—It is proper to refuse a charge which singles out or gives undue prominence to the testimony of a witness.

.0. *Same; misleading charge.*—It is proper to refuse a charge which instructs the jury to acquit if the deceased was thrown into a river belonging to another State, since the murder may have been committed before such disposition of the body and the charge is, consequently, misleading.

1. *Same; same.*— Charges referring to the links and chains in the testimony are misleading and confusing and, consequently, properly refused.

APPEAL from the Circuit Court of Barbour.

Tried before the Hon. A. A. EVANS.

The appellants were indicted and convicted in the court below for the murder of Jared Engram. The evidence relied on by the State was entirely circumstantial, tending to show that the homicide was committed in Eufaula, Ala., in a house of ill fame kept by the defendant, Anna Vaughn, and that it occurred on the night of December 25, 1899. All the defendants were shown to have been at this house on said night and the last time deceased was seen alive was at this time and place, so far as the testimony of the State tended to show. There was evidence tending to show that persons in the neighborhood heard a fight on the night of December 25, 1899, and heard moans and groans as if some one was being choked. This continued for some time, and after it ceased a buggy was driven off in the direction of the Chattahoochee river. On the 12th of February, 1900, the bridge keeper at the junction of

the Chattahoochee and Flint rivers discovered and captured a body which had bruises and marks on the neck and chest and a handkerchief crammed in the throat. This body was buried there, and afterwards exhumed at the instance of the father of the deceased and identified by the features and clothing, and reburied at the place where found. The handkerchief which was in the throat was introduced in evidence after being identified by the witness who discovered the body in connection with the testimony of another witness that it was similar to several handkerchiefs washed by the witness for the defendant, Gertrude Howard, several days before the alleged date of the homicide. This was excepted to by said defendant. The bill of exceptions was in the form of a stenographic report, and showed that Dr. Copeland was examined as a witness in behalf of defendants, and in the report of his testimony there appears on page 103 of the transcript the heading "Cross Examination." Immediately following this heading certain testimony was elicited in regard to a telephone message. The first question asked him after the appearance of this heading was: "Where do you reside?" After this follow questions and answers as to a telephone message purporting to come from the deceased, but the witness said he did not know the voice of deceased. The time was located at 9 or 9:30 o'clock, Christmas night, 1899. After this testimony was elicited, the State moved its exclusion, which motion was granted over defendant's objection and exception. Further on in the bill purporting to give the testimony of this witness the same heading "Cross Examination" appeared again.

It was shown by the testimony of Will Cameron for the State that between 8 and 9 o'clock he saw deceased lying on a bed in Anna Vaughn's house, and covered up except as to his head, and apparently sleeping very quietly. That he remarked upon this fact, and was told not to disturb him, whereupon witness left the house and never saw Engram afterwards. The defense also showed by the testimony of Dr. Mitchell that Engram came to his office on the afternoon of December 25th, 1899, and he prescribed for him, and Engram asked if he would call

to see him that night if requested, in the neighborhood of the alleged homicide, and that about 11 o'clock that night he was called up over the telephone in accordance with the request of the previous afternoon. The message to Dr. Copeland requested to know whether he would call to see Engram in said neighborhood about 11 o'clock that night. The testimony for the defense tended to show that Engram was seen on the 1st day of January, 1900, and there was further testimony tending to show that Engram had made various declarations of suicide on December 25th, 1899, and that he was enamored of the defendant Gertrude Howard, who had forsaken him. The other facts necessary to an understanding of the opinion sufficiently appear therein. The defendant requested in writing the following charges, which were refused: (1.) "The court charges the jury that if they believe the evidence, they must acquit the defendant." (2.) "If the jury believe from the evidence that Cliff Evarts told the truth about seeing Engram on the night of January 1st, 1900, they must acquit." (3.) "If the jury believe from the evidence that the testimony of Cliff Evarts is true, and from that testimony a reasonable doubt is raised in the minds of the jury, then the jury must acquit." (4.) "The court charges you that the average water mark of the Chattahoochee river is the Georgia line, and that if you believe the deceased was thrown in the Chattahoochee river then you cannot find the defendants guilty." (5.) "The court charges the jury that if there is a missing link in the chain of circumstances connecting the defendants with the commission of the crime, the whole chain falls, and you should return a verdict of not guilty." (6.) "The court charges the jury that before a conviction can be had under circumstantial evidence, the circumstances must connect the defendant with the commission of the crime beyond a reasonable doubt, and the links in the chain of circumstances must not only connect the defendants with the commission of the crime, but must exclude every other reasonable hypothesis save the guilt of the accused, and if the circumstances will support any other reasonable hypothesis then the guilt of the accused you must return a verdict of not guilty."

From the judgment of conviction the defendants appeal, and assign for error the rulings of the court on the evidence and the refusal of the charges requested.

C. S. McDOWELL, JR., ALTO V. LEE, HATCHER & CORSON, and HARMON DENT & WEIL, for appellants, among other things insisted that the evidence of the telephone message, though illegal, having been elicited by the State, could not be excluded on its motion and cited in support thereof, *Tolliver's Case*, 94 Ala. 111.

CHARLES G. BROWN, Attorney-General, for the State, insisted, among other things, that illegal evidence may be excluded at any stage of the trial, and cited in support thereof *Liner's Case*, 124 Ala. 1.

HARALSON, J.—1. There was evidence tending to show that Jared Engram was dead. The witness, Smedley, for the State, stated that he was watchman for the L. & N. R. R. Co. at their draw bridge on the Appalachicola river, Jackson county, Florida, which river is formed by the junction of the Chattahoochee and Flint rivers; that on the 12th February, he discovered a dead human body floating down the river with a handkerchief protruding from its mouth. He secured the body, reported the fact to the coroner, who came, examined and buried it; that the coroner pulled the handkerchief out of the man's mouth and throat into which it was crammed. This witness, on the trial, gave evidence tending to identify the handkerchief, as the one taken from the throat and mouth of the dead man. The question of its identification, in connection with all the evidence on the subject, was one for the jury, and the court committed no error in allowing the handkerchief to go to the jury, against the objection of defendants, that it had not been sufficiently identified.

2. The evidence for the State tended to show, that deceased was killed on the night of the 25th of December, 1899, at a house of ill fame kept by the defendants, Anna Vaughn and Gertrude Howard. The witness, Will Cameron, for the State, testified that deceased went to said house early that night, and witness found him there;

that he and deceased left and went away and deceased soon returned to the house, and in a short while witness returned and found deceased and Anna Vaughn in a bed, the deceased apparently asleep, and defendants, John Miller and Solon Moore, sitting by the fire; that deceased appeared to be resting well, and this was about 9 or 10 o'clock; and at this time, defendants, Moore, Brazier and John Miller, besides the two women, were there. Witness left, but returned again later, and found Miller standing up putting on his clothes; that Miller said to Anna Vaughn, using an oath: "You have been the cause of one man's death, and you think you will be the cause of mine, but I am going to get away." Defendants moved to exclude this remark. Witness was asked whether Anna heard the remark. He replied, that Miller was talking to her; that they were only a step or two apart, and he spoke loud enough for her to have heard it. The court allowed the evidence as against Anna, and an exception was reserved by her, because it was not shown that Anna heard it, nor was it shown that the remark referred to the deceased. The evidence having tended to show that deceased had been killed in this house, the fact whether Anna heard this remark, which had some tendency to incriminate her, and whether it had reference to deceased as the man whose death she had caused, were questions for the jury, under all the evidence, to determine.

3. Dr. Copeland, a witness for defendants, testified that about 8 or 9 o'clock, Christmas night, he was telephoned to know if he would make a call that night at 11 o'clock; that he replied yes, and asked who it was that made the inquiry, and the person replied Jared Engram; that he did not recognize the voice, whose it was, and he was not familiar with Jared Engram's voice. The State objected to this evidence, as to the telephone message, on the ground that it was illegal, irrelevant and immaterial, and it was excluded. If material, it was certainly not admissible against the State, in the absence of proof that it was the deceased who sent the message. From aught appearing another than, and a stranger to, deceased may have sent it.

It is urged by defendant's counsel that in the exclusion of this evidence on motion of the State, there was error, because it was called for, as contended, on the cross examination of defendants' witness by the State. It may be, if this evidence was called out by the State on cross examination, the court for that reason, might have properly refused to exclude it, yet, it might not follow, that the court would be put in error in its exclusion, since of its own motion the court may exclude illegal evidence at any stage of the trial, and the evidence, so far as appears, was certainly immaterial, hearsay and incompetent.—*Liner v. The State,* 124 Ala. 1, 6.

It satisfactorily appears, however, that this evidence was not called out by the State, but by defendants. Dr. Copeland was being examined by defendants, to prove facts tending to show that Engram could not have been killed at Anna Vaughn's house on Christmas night, 1899. To this end, he was interrogated by defendants, in respect to the stains on the floor of said house, the object of the examination being to show, that these were not blood stains; also to show, that the body when found in the river, on the 12th February, 1900, about a hundred and fifty-six miles below Eufaula, was in too good a state of preservation for death to have occurred and the body to have been thrown in the river, so far back as December 25th, 1899, and that at half past 9 o'clock on that night, which was at a later hour than some of the evidence for the State tended to show Engram was killed, the witness received the said telephone message purporting to be from deceased. All this was evidence of defensive matters, such as the defendants would naturally seek to produce, and the State would have no interest to prove. Again, the State interposed other objections to some of the evidence as brought out, further on in the examination of the witness, as was done to the telephone message, which would not have been done, if it had been cross-examining the witness. Indeed, the suggestion of a cross-examination of the witness by the State would not arise from anything asked or replied by him, but repelled, if it were not for the fact, that at the top of the page, 103 of the transcript, below which this telephone message and other defensive

matters appear, are the words, "Cross Examination."
Without these words the direct examination, from all the
indications, continued down to the middle of page 111,
where the words "Cross Examination," again occur, and
where the cross-questioning of the witness by the State,
on matters brought out to that point by defendant, be-
gan. It is clear, that the words "Cross Examination,"
as they appear on the one or the other of these pages, is
a clerical mistake, as there were not two cross-examina-
tions, and no room is left to doubt, that the first head-
ing is a clerical, self-correcting misprision, and the
cross-examination of the witness really began on page
111, where the transcript shows a cross-examination
began. This is further borne out, if more were needed, by
the fact that when the State closed its cross-examination
of this witness, the defendants next called and examined
Dr. Mitchell, about a telephone message it was shown
by him he received from some one giving his name as
Jared Engram, on the same night, about 11 o'clock,
thus indicating that it was defendants, and not the State,
who were seeking to prove the first of these messages, as
well as the last,—both being in the interest of the de-
fense, and against the interests of the prosecution.

4.    The witness, Dr. Copeland, also testified that he
took a plane to the house, where it was alleged de-
ceased was killed, and planed up some shavings.    He
was asked :    "If the blood stains had been there, dry up-
on the floor for, say two months, would there have been
evidence of blood or blood stains upon the shavings you
took up?"    The witness replied, "that there would have
been, unless some alkali or acid had been used,—a weak
alkali.    A weak alkali destroys blood corpuscles, a
strong alkali develops them.    Soap is a weak alkali."
The State had offered no evidence of blood stains on the
floor or elsewhere, and it was not shown the floor was in
the same condition as it was in on the night of the al-
leged killing.    For these reasons, on the objection that
the evidence was illegal, irrelevant and incompetent,
what the doctor said as to blood corpuscles was ex-
cluded.    The ruling was free from error, if not for all
the reasons assigned, certainly for the one, that the doc-
tor did not state whether there was any evidence of

blood in the shavings he took or not. The fact that he planed the shavings, without more, was immaterial, and was of no value or detriment as evidence to the defendants. Nor was there error in excluding the evidence of the witness, Bradley, for defendants, as to spots he saw on the floor. He did not testify that there were blood stains on the floor, and the State had called for no such evidence. The absence of blood stains on the floor, after the killing, was not a fact tending to defendant's exculpation, when it was not shown or attempted to be shown, that the circumstances of the killing were such that the stains of blood would probably have been found on the floor.—*Sylvester v. The State*, 72 Ala. 201.

5. The defendants offered to prove as to Moore and Brazier, that when Moore was arrested, he went to his house, unaccompanied by the sheriff, to change his clothes ,and returned to the arresting officer, and that Brazier voluntarily surrendered himself. The State objected, because it had offered no evidence tending to show flight of these defendants, and because the evidence was irrelevant, illegal and incompetent, which objection was sustained without error.—*Jordan v. State*, 81 Ala. 31; *Chamblee v. State*, 78 Ala. 466.

6. The defendants requested the general charge, which was refused, on the theory that the *corpus delicti*, and the venue of the crime had not been shown. As to the venue, the evidence showed without dispute, that Anna Vaughn's house is in Barbour county. When and where the deceased was killed, the evidence is not positive. But, the evidence did tend to show, that deceased was killed at Anna Vaughn's house, on the night of the 25th December, 1899. If there had been no proof that the offense was committed in Barbour county, the court should have given the general charge; but, such charge would have been erroneous, if there was proof tending to show the venue to have been in Barbour.—*Harvey v. The State*, 125 Ala. 47, and authorities there cited. When found in the river, one hundred and fifty-six miles below Eufaula, there was a handkerchief partly protruding from deceased's mouth, as testified to by Smedley, who discovered the body. He also stated, that there were some bruises on the arms and chest, which seemed black; that the blood had set-

tled under his neck and throat, and the balance of the body was white, with no marks on it except on the breast, arms and throat. He stated as to the handkerchief, that "it was crammed down his mouth and throat. I was there when it was pulled out. It seemed to be down his throat, way down. It was pulled out perfectly straight." Jack Martin, for the State, testified that he was attracted by the noises in the said house that night; that he heard groaning until it ceased; that it went on for about half an hour, and was like some one being choked to death. Nancy Martin, the wife of Jack, who testified to what she heard going on in said house that night, stated, that they seemed to be fighting, and she heard Anna Vaughn say: "Kill him, G— d— him." Lou Sheriman testified, that about eleven o'clock the people in the house went to fighting, and between twelve and one o'clock they commenced a big fight; that she heard some one groan, and she heard Anna say: "take the son of a b— out of my house," and they all got out of the back door, and she heard a man groaning. Margaret Warner testified that she did washing for Gertrude Howard just before Christmas. She was handed the handkerchief taken from the mouth and throat of deceased, and was asked if she had washed for her some handkerchiefs like it. She replied that she had washed three like that for her. The father of deceased testified that he, with others, exhumed the dead body, and he swore positively that it was the body of his missing son. He identified him by his size, features, teeth and clothing, and if his testimony is to be believed, the identification was complete and certain. McLeod testified that he served at Skillman's stable in Eufaula on Christmas, 1899; that Moore had his horse hitched up about half-past seven o'clock that night, and drove away; that witness was there all night; that about two hours before day, Moore, with a woman in the buggy, returned to the stable and got out and went down the hill; that the horse was the hottest one he had ever seen, and the buggy was muddy. Skillman, the livery stable keeper, testified to Moore's getting the horse Christmas night, and to his finding the animal there the next morning, indicating a hard and hot drive. Shelly testified that

[Vaughn *et al.* v. The State.]

... / after Christmas, Moore and Brazier, who came ... Eufaula, stopped at his store, two miles north of ... ) vn, and asked if he knew Jared Engram, and he lived, and having told him about two miles Moore said: "He went to a w——e house last night ... iised hell."

... r this evidence, and more of a like character, it e province of the court, to submit to the jury the ... n of the venue of the crime. Nor was it im- ... as contended, for the court to refuse the charge nt of sufficient proof of the *corpus delicti.* That ... id Engram was dead, seems to have been estab- ... beyond dispute, and that his death was accom- ... I by violence at the hands of another or others. ... *uslow v. The State,* 76 Ala. 47, touching the ques- ... the *corpus delicti,* this court said: "While great ... n, founded on experience in the administration of iminal law should be observed, that a person d may not be punished for an alleged crime not ly committed, direct and positive evidence of the ... *delicti* is not indispensable. Like any other he subject of judicial investigation, it may be ... by circumstantial evidence. * * * We can- ... ent to the proposition insisted on, that the suffi- ... of the proof of the *corpus delicti* is a question for ... rt, and not for the jury. Greenleaf, in the sec- ... ted [3 Green. Ev. § 30], observes: 'The proof of ... rge, in criminal cases, involves the proof of two ... t propositions; first, that the act itself was done; ... condly, that it was done by the person charged, ... none other—in other words, proof of the *corpus* ... , and of the identity of the prisoner' The ascer- ... nt that an offense has been committed, is as es- ... I to conviction, as that the defendant is the guilty

Both of these essential propositions are for the ... uation of the jury, and both must be proved be- ... reasonable doubt. To hold that the court must ... ultimately either of these propositions. would be ... mount to a denial of the constitutional right of ... by jury. * * * It is the province of the judge ... ermine, whether there is testimony sufficient to ... it appear, *prima facie,* that a crime has been com- ... l. The evidence on which the judge acts, may not

necessarily establish the *corpus delicti*. It may be, and often is, conflicting and contradictory. In such case, the credibility of the witnesses, and the sufficiency of the entire evidence, are for the ultimate decision of the jury."

7. The court did not err in refusing the second and third charges requested by defendants. Cliff Evarts swore that he saw deceased between 5 and 6 o'clock in the afternoon of January 1, 1900, and that this was after dark. When asked to state why he knew it was on the 1st January he saw him, the witness replied: "I know it because it was so cold, I could not do anything at the shop," and gives other reasons for the opinion he expressed. Other witnesses whom he named as being present when he saw deceased, testified in contradiction to this statement of Evarts. The charges are subject to the vice that they single out and give prominence to this witness' evidence, which was not proper. The court, as the record shows, instructed the jury, at the request of defendants, that if they believed from the evidence that Jared Engram was seen alive on the night of January 1st, 1900, they must acquit the defendants. This charge gave defendants all the advantage they were entitled to on the subject of said charges Nos. 2 and 3.

It is sufficient to say in condemnation of charge 4 requested and refused, that the deceased may, for aught hypothesized, have been thrown in the river after he had been killed in Eufaula.

Charges 5 and 6 have been too often condemned by this court to require consideration.—*Tompkins v. State,* 32 Ala. 569; *Wharton v. State,* 73 Ala. 367; *Grant v. State,* 97 Ala. 35.

No error appearing, let the judgment and sentence of the court below be affirmed.

Affirmed.