36 So.2d 336

### JARRELL v. STATE.

### 5 Div. 445.

Supreme Court of Alabama.

June 30, 1948.

R. C. Wallace and C. S. Moon, both of LaFayette, for appellant.

A. A. Carmichael, Atty. Gen., and Jas. T. Hardin, Asst. Atty. Gen., for the State.

LAWSON, Justice.

Appellant was convicted of the murder of his wife and his punishment fixed at life imprisonment.

Counsel for appellant strenuously insist that the proof is insufficient to establish the corpus delicti, and that the affirmative charge was due to be given at the defendant's request. In every criminal prosecution, of course, the burden is on the State to prove beyond a reasonable doubt that the crime· charged has been committed and that the accused is the person who committed it. Hill v. State, 207 Ala. 444, 93 So. 460; Ratliff v. State, 212 Ala. 410, 102 So. 621. In Hill v. State, supra, it was said: "Circumstantial evidence may afford satisfactory proof of the corpus delicti; and if any facts are shown from which the jury may reasonably infer that the crime has been committed, the question must be submitted to the jury, and other evidence tending to implicate the accused is thereby rendered admissible." 207 Ala. 446, 93 So. 461.

The defendant and his wife lived in a small house belonging to one Tom Lindsey. Lindsey's home was from 150 to 200 yards distant from the house occupied by defendant and his wife. The road to the defendant's' house practically passed through the Lindsey yard. The house occupied by defendant consisted of a front porch and three rooms. There was a door leading into each of the front rooms from the porch. As viewed from the front, the right front room was a bedroom and the left front room was used as a kitchen. Immediately back of the bedroom was a room referred to in the evidence as a "shed room." There was a "stack" chimney between the two front rooms. There was a doorway between the two front rooms situated toward the front of the house. A closet was built in the bedroom between the chimney and the back wall of the room.

Tom Lindsey, a witness for the State, testified that he arrived at his home around 11:15 on the night of August 25, 1947;

that he noticed that lights were on in the defendant's home; that he retired soon after getting home and a short time after he went to bed some one called him from the Jarrell house but he did not respond; that at approximately 3:30 a. m. the following morning, August 26th, he awoke and observed a car leaving the home of appellant and that shortly thereafter two cars passed through his yard enroute to defendant's house; that within a few minutes a sister of defendant came to his house and asked him to go to defendant's home; that upon arriving there he saw Mrs. Jarrell, fully dressed, lying on the kitchen floor, her feet on the hearth and her body extending toward the center of the room, with her head resting on a pillow; that he touched the body of Mrs. Jarrell and that it was cold and he concluded she was dead; that the defendant was drunk and sitting beside the body of his wife; that defendant made no statement at that time as to his wife's condition; that he did not see a gun or firearm of any kind in the kitchen but did see a .22 caliber rifle in a corner of the bedroom; that he had seen a rifle there on previous visits; that he did not hear a rifle shot at any time during the night.

A physician who was summoned by Lindsey arrived at the defendant's home about 5:00 a. m. When he arrived the body of Mrs. Jarrell was in the same position as testified to by Lindsey. Rigor mortis had set in. He made no examination at that time to discover the cause of death. This physician testified that when he arrived there the defendant "had the appearance of a man who had been drinking for a long time."

The body of Mrs. Jarrell was removed to an undertaking establishment shortly after the physician pronounced her dead. In removing the clothing on the body the undertaker discovered a small hole in the dress and slip. His examination of the body disclosed "a gunshot wound." The undertaker notified the physical and the sheriff of the county.

An assistant State Toxicologist, Mr. Shoffeitt, was immediately contacted. He performed an autopsy on the body of the deceased and made certain tests in connection with the deceased's clothing. He testified in behalf of the State. The evidence shows that he was an expert concerning the matters about which he expressed an opinion. From his testimony it appears that he performed the autopsy at about 10:00 on the morning of August 26, 1947, which was approximately eight to ten hours after death, according to his opinion. The only sign of physical violence which he found on the body was a hole in the chest approximately three-sixteenths of an inch in diameter. As a result of cutting into the body and probing the hole in the chest he found parts of a .22 caliber hollow-point lead bullet, which had severed a large blood vessel, and the abdominal cavity was filled with large clots of blood. He expressed the opinion that death resulted from internal hemorrhages caused by the bullet severing the blood vessel. Powder burns were found on the deceased's dress and slip. Based on the nature of the wound and the characteristics of the powder burns on the clothing, he expressed the opinion that when the rifle was fired its muzzle was not in contact with the dress, but was from six to eighteen inches away.

After completing the post-mortem examination, Mr. Shoffeitt, accompanied by the sheriff of the county and the State investigator, went to the defendant's home. They arrived there about 11:20 a. m. Defendant was not at home. The house was locked but the officers were let in by one Adams, who had a key. They made a thorough search of the house but found no firearms of any kind. They did find a box of .22 long hollow-point cartridges. They also found two .22 caliber "hulls," the examination of which disclosed that they had been fired from the same rifle. One of the "hulls" was found near a fire screen on the hearth in the bedroom and the other was under a chair which was in a corner of the bedroom near the bed. A freshly made "bullet hole" was discovered in the corner of the room diagonally opposite from the corner where one of the "hulls" was found. There was "a little piece or stick of wood stuck in that hole." A .22 caliber "bullet" was found on the

54

floor in close proximity to the place where the "bullet hole" was located.

■ The officers then proceeded to the home of defendant's father, where they questioned defendant. At that time he appeared to be suffering from the effects of drinking. He insisted that he did not shoot his wife. Although he refused to sign a written statement, he did answer questions concerning the events of the preceding night. He said that during the early hours of the night he and his wife rode into town and that she secured a rifle at Hamp Smith's filling station for the purpose of going fox hunting. As to what transpired after they returned to their home, he stated first that after he had gone to bed he heard his wife fall and found her lying on the floor of the kitchen and placed a pillow under her head, thinking that she had fainted, inasmuch as she was subject to such attacks. He said he was physically unable to put her in bed. When asked to explain the fact that a bullet had been found in the body of his wife, he said he remembered being awakened by a discharge of a firearm and on going into the kitchen he found the body of his wife lying on the floor. He examined her for gunshot wounds but found none. When apprised of the fact that two empty .22 caliber "hulls" had been found in the house and that, in addition to the bullet which was located in the body of his wife, another bullet had been found on the floor of the closet in the bedroom, he stated that he remembered that before he went to bed his wife was "playing with an old army rifle and that she fired a round"; that when he went to bed his wife was reading and that later he was awakened by the rifle shot and on going into the kitchen he found her lying on the floor. According to his statement after he and his wife returned home after their trip to town, no one was present in the house except them. To one of the officers he stated that after he was awakened by the shot and went into the kitchen he saw the rifle lying by the side of his wife and picked it up and brought it back into the bedroom. As before indicated, the questioning of defendant first took place at the home of his father, where he told them that he had placed the rifle back in the bedroom and that he would go with them to his home and show them where the rifle was. Defendant accompanied the officers to his home and pointed out the place in the bedroom where he had stated he had placed the rifle, but the rifle was not there. The defendant also told the officers in effect that after the body of his wife was removed to the undertaking establishment he left his home with his mother and sister and went to the home of his father, where he remained until taken back to his home by the officers.

The statements made by the defendant were merely by way of explanation and exoneration; they were not in the nature of a confession. Out of an abundance of caution, however, the court required the State to show that the statements were voluntarily made. We think they were clearly admissible. Ratliff v. State, supra.

■ The defendant did not testify himself. The theory of defense seems to have been that the deceased took her own life. To that end he offered evidence to the effect that on the night of August 25th, the defendant and the deceased arrived at Hamp Smith's filling station about 8 o'clock in defendant's car. Defendant was drunk and the deceased was driving the car. The deceased sought to borrow a rifle from Smith, which she said she wanted to use in hunting fox. Smith did not have a rifle but the deceased secured a .22 automatic Springfield rifle and ammunition therefor from one Wayne Cox.

A sister of the defendant testified that she arrived at the defendant's home about 9 o'clock on the morning of August 26th, several hours after the death of Mrs. Jarrell, and that she saw a rifle in the kitchen and another in the bedroom.

As before indicated, the officers found no weapon of any kind when they searched the premises around 11:20 that morning. Evidently for the purpose of showing that he did not have an opportunity to dispose of the weapon or weapons, the defendant offered evidence tending to show that he left his own home about 6:00 a. m. and went to the home of his father, where he remained until he was accompanied to his own home by the officers several hours later.

Unquestionably Mrs. Jarrell's death resulted from a rifle shot. No one else was present at the time the shot was fired except deceased and defendant. So under the evidence in this case the question for the jury's decision was whether or not Mrs. Jarrell met her death at her own hand or was killed by the discharge of the rifle through the agency of the defendant.

The defendant's version of the events that transpired after he and his wife returned to their home, as related to the officers, evidenced an effort on his part to change his "story" so as to coincide with the physical facts as they were gradually revealed to him by the questioning of the officers. According to the expert testimony, the muzzle of the rifle was not in contact with the body of Mrs. Jarrell or the dress she was wearing at the time the shot was fired. The muzzle was from six to eighteen inches away. This fact would at least indicate that deceased did not intentionally kill herself, as it would have been extremely difficult, if not impossible, for her to have pulled the trigger on such a rifle with its muzzle that far distant from her body.

We are of the opinion that the evidence in this case was sufficient upon which the jury could find that the crime had been committed, and that the defendant was the guilty agent, although there were no eyewitnesses, and the evidence was circumstantial. Ducett v. State, 186 Ala. 34, 65 So. 351; Ratliff v. State, supra; Blue v. State, 246 Ala. 73, 19 So.2d 11; Ferguson v. Commonwealth, 291 Ky. 222, 163 S.W.2d 449.

Likewise, we hold that the trial court did not err in overruling the motion for a new trial in so far as it was predicated on the weight of the evidence.

■ Where, as here, the theory of the defense was that the deceased fired the shot which took her life, without agency on the part of the defendant, any evidence tending to show that the deceased came to her death by her own act is admissible.— Nordan v. State, 143 Ala. 13, 39 So. 406. It was no doubt upon this principle that the trial court permitted the defendant to show that a few hours before her death, Mrs. Jarrell borrowed a .22 automatic rifle and ammunition therefor. But the court refused to allow the defendant to show that at the time she borrowed the rifle she asked for and was given instructions as to how to operate it, and also refused to permit the defendant to show that the rifle was loaded when she left the filling station where she obtained it. In view of the nature of the evidence upon which the State relied for a conviction in this case, we think such proof should have been allowed. True, it does not necessarily follow that because deceased asked to be instructed as to how to operate the rifle that she intended to bring about her own destruction. But we think that it was a circumstance which should have been before the jury in view of the fact that only a few hours elapsed between the time she obtained the rifle and the time of her death. It was for the jury to say as to whether or not the borrowing of the rifle and the getting of instruction as to its use indicated that the deceased was making preparation to take her own life.

■ The contention is made on behalf of appellant that the trial court erred in refusing to exclude an argument by the solicitor for the State as follows: "Tom Lindsey, who just lived 150 yards from him [defendant] did not come here and testify as to his good character for peace and quiet." The defendant called a large number of witnesses who testified that his reputation for peace and quiet was good. The State did not attempt to show by any witness that the defendant's reputation for peace and quiet was bad. As before indicated, the defendant lived in a house owned by Lindsey, which house was situated close to Lindsey's home. Lindsey had testified for the State but he was not called upon by either party to testify as to the reputation of the defendant for peace and quiet.

The rule is well settled in this jurisdiction that no unfavorable comment can be made because of the absence of witnesses equally accessible to both parties. Brock v. State, 123 Ala. 24, 26 So. 329; Coppin v. State, 123 Ala. 58, 26 So. 333; Forman v. State, 190 Ala. 22, 67 So. 583; Jackson v. State, 193 Ala. 36, 69 So. 130; Crawford v. State, 112 Ala. 1, 21 So. 214; Hutcherson v. State, 165 Ala. 16, 50 So. 1027, 138

56

Am.St.Rep. 17; Barnett v. State, 165 Ala. 59, 51 So. 299.

 Counsel for a party to whom a particular person is not available as a witness may comment on the failure of the other party to whom that person is available to call him as a witness. It has been held that it was not reversible error for the solicitor to comment on the failure of the defendant to call his father as a witness in his behalf, since the father is so closely related to the son by blood that he is bound to be hostile to the State and cannot be said to be as available to the State as to the defendant. Waller v. State, 242 Ala. 1, 4 So.2d 911. To like effect is the case of Barnes v. State, 31 Ala.App. 187, 14 So. 2d 242, certiorari denied, 244 Ala. 597, 14 So.2d 246. But such is not the situation in the instant case. There is nothing in this record to indicate that Tom Lindsey was related to the defendant in any way or that he was disposed to be favorable to him. Certainly there is nothing in this record to show that Lindsey was expected to be hostile to the State. That he was not hostile to the State is apparent from his testimony given in this case on behalf of the State. The effect of the solicitor's remark was to criticize the defendant for failing to call as a witness as to his reputation for peace and quiet, a person who had already testified on behalf of the prosecution.

 Counsel may comment on the failure of his adversary to produce evidence of the good character of his witness (especially when he is the witness) when impeaching evidence has been introduced or when the comment is pertinent to answer an argument made by opposing counsel. McDowell v. State, 238 Ala. 482, 191 So. 894; Bardin v. State, 143 Ala. 74, 38 So. 833; Nicholson v. State, 149 Ala. 61, 42 So. 1015. But in this case the State did not attempt to show that the defendant had a bad reputation for peace and quiet, although, as before shown, a large number of witnesses testified that defendant's reputation for peace and quiet was good. Nor does the record show that the argument of the solicitor, here complained of, was made in answer to argument made by opposing counsel.

 When one party to a suit alone has the right to offer evidence on a given point, the jury has a right to infer no such evidence exists, and counsel for the opposite party to such suit has the right to comment on the absence of such evidence as a material matter for the consideration of the jury. Earle v. State, 1 Ala.App. 183, 56 So. 32. In the instant case, the defendant having placed his reputation for peace and quiet in issue, the State had the right to show, if it could, that such reputation was bad, and to that end could have called Tom Lindsey. Hence the principle declared in Earle v. State, supra, does not have application here.

The State relies upon the case of Martin v. State, 18 Ala.App. 434, 92 So. 913. In that case the solicitor for the State, in his argument to the jury, said: "Sam Gullat is the only man brought from that community to testify for the defendant as to his good character." We think the argument here complained of is of a character much more prejudicial to the defendant than that considered in the Martin case, supra. In that case the solicitor merely called to the attention of the jury the fact that of all the people in a given community, the defendant produced only one man to testify as to his good character. Here the solicitor criticized the defendant because he failed to produce the testimony of one certain individual as to the defendant's reputation for peace and quiet, and that individual had been the first witness that the State had called to testify against the defendant.

 We think it clear that Tom Lindsey was more available to the State than to the defendant and if Lindsey considered the defendant's reputation for peace and quiet to be bad the State should have produced him as a witness to testify to that effect and the solicitor should not have been permitted to indicate to the jury, by his remarks, that since Lindsey was not called by defendant to testify as to defendant's reputation for peace and quiet that Lindsey considered such reputation to be bad. Such is the effect of the solicitor's argument.

We are of the opinion that such argument was highly prejudicial to the defend-

ant and that the failure of the trial court to exclude it from the jury constitutes reversible error.

 On cross-examination of several of the witnesses who testified that the defendant's reputation for peace and quiet was good, the solicitor for the State proponded, either verbatim or in substance, the following question: "You have heard that he and his wife married and they separated because he assaulted her with a gun, and then they remarried, is that right?"

Defendant's objections being overruled, exceptions were duly noted. We think the objections to the question were properly overruled, under the authority of Hawes v. State, 88 Ala. 37, 7 So. 302, and Barnett v. State, 165 Ala. 59, 51 So. 299.

 The trial court in its oral charge charged the jury on the law of murder and of manslaughter in the first degree, but did not charge as to manslaughter in the second degree. It is here insisted that the failure of the trial court to charge on manslaughter in the second degree constitutes reversible error. But that question is not presented to us properly. No exception to the oral charge of the court appears to have been taken or reserved for or by the defendant. No special charge appears to have been requested for or by the defendant relating to the matter of the guilt vel non of the defendant of manslaughter in the second degree. The partial or total failure or omission of a trial court to instruct a jury in its oral charge with reference to principles or rules of law that may be, or even are, involved in the trial cannot be made the basis for a reviewable question on appeal. Williams v. State, 147 Ala. 10, 41 So. 992; Jones v. State, 174 Ala. 85, 57 So. 36. The party's remedy in such cases of mere failure or omission is to request special written instructions. McPherson v. State, 198 Ala. 5, 73 So. 387; Rice v. State, 18 Ala. App. 366, 92 So. 81; Norris v. State, 229 Ala. 226, 156 So. 556; Peterson v. State, 227 Ala. 361, 150 So. 156.

 We express no opinion as to whether under the facts here presented the trial court should have charged on the law of manslaughter in the second degree. However, we do not know that the evidence will be the same on another trial, and we state that it is much the safer rule to charge upon all the degrees of homicide included in the indictment, when a party is on trial for murder, unless it is perfectly clear to the judicial mind that there is no evidence tending to bring the offense within some particular degree. Pierson v. State, 99 Ala. 148, 13 So. 550.

For the errors pointed out, the judgment must be reversed and the cause remanded.

Reversed and remanded.

GARDNER, C. J., and FOSTER and STAKELY, JJ., concur.