47 So.2d 276

**HELMS v. STATE.**

**6 Div. 980.**

Supreme Court of Alabama.

June 22, 1950.

John W. Brown and H. G. Bailey, of Boaz, for appellant.

A. A. Carmichael, Atty. Gen., and L. E. Barton, Asst. Atty. Gen., for the State.

LAWSON, Justice.

The appellant, Marvin Helms, was indicted for the murder of his wife, Pearl Helms. Upon his trial he was convicted of murder in the first degree and was sentenced to the penitentiary for life. This appeal is prosecuted by him for the purpose of reversing the judgment of conviction.

It is insisted by appellant that the evidence is not sufficient to support a conviction of any degree of homicide. If this is true, the court was in error in refusing to give the affirmative charges as requested by appellant, defendant below, and in overruling the grounds of his motion for new trial which take the point that the verdict was contrary to the weight of the evidence. Blue v. State, 246 Ala. 73, 19 So.2d 11.

The defendant and the deceased lived on a farm approximately four miles west of Johnson's Crossing, a community in Cullman County. The deceased was the second wife of defendant. They had been married for approximately three years. The defendant was the father of nine children by his first wife, one of whom, Ollie Helms, was married to the daughter of George Twilley, who lived a short distance from the home of the defendant.

Ollie Helms and his wife lived in "town," presumably Cullman. They came to the home of George Twilley to spend the 1949 Fourth of July week-end.

On Sunday morning, July 3, 1949, George Twilley and Ollie Helms walked to the home of the defendant. They drank whisky and beer with the defendant and the deceased and remained for dinner, which the deceased prepared. Some time after dinner, the four of them drove to Johnson's Crossing in the defendant's automobile, which he drove. At this point the deceased, Mrs. Helms, appeared to be more intoxicated than any of the men. After making some purchases at Hamilton's store, the party proceeded in the general direction of their homes. They stopped at the home of Jim Crawford. None of them got out of the car, but Mr. Crawford joined them, or some of them, in drinking whisky. From the Crawford home they proceeded to the home of George Twilley. The deceased,

Pearl Helms, did not get out of the car when they arrived at the Twilley farm. The men did get out of the automobile and proceeded to the barn and hog pen, where more whisky was consumed.

George Twilley, a witness for the State, testified in effect that while the men were at the hog pen the defendant called his wife twice and, receiving no answer, said to Twilley, "If she has run off and left me, I will kill the —— of a ——."

The deceased was not in the automobile when the men returned to it. She was not seen around the Twilley farm. According to State witnesses, the defendant, upon finding his wife gone, said, "Just let her go to hell."

Evidence for the defendant is to the effect that he made no such statements.

The witness Twilley also testified that during the course of the afternoon he heard the deceased curse the defendant.

The defendant left the Twilley home in his automobile alone between 6:30 and 7:00 p. m. He had proceeded only a short distance in the general direction of his home when his automobile went into a ditch on the left-hand side of the road. His son, Ollie, and George Twilley went to his assistance, but they were unable to get the automobile back into the road. Ollie secured the assistance of William Crawford, who used his truck in getting defendant's car back into the road.

When Ollie and Crawford arrived with the truck, the defendant was lying on the ditch bank in an intoxicated condition. He did not speak to Crawford, but did make inquiry as to the whereabouts of his wife. Ollie assisted his father into the automobile and then drove him home. They arrived there after dark at about 7:30 p. m. There was no light on in the residence. Ollie used the flashlight which he obtained from the glove compartment of his father's automobile. He helped his father into the house and then put him in bed without removing his clothes or shoes. Ollie placed the flashlight on the radio table which was near the bed. He did not see his stepmother in the house. Neither he nor his father made any effort to ascertain whether she

had come home. Ollie then returned to the home of his father-in-law, George Twilley, where he spent the night.

Between 6:00 and 6:30 on Monday morning, July 4, 1949, the defendant walked from his home to that of George Twilley, and informed Twilley and Ollie that his wife, Pearl, had been killed and requested that the "law" be notified and an ambulance called.

Sheriff Hyatt, two of his deputies, the coroner and others arrived at the home of defendant between eight and nine o'clock on the morning of July 4, 1949.

They found the body of Mrs. Pearl Helms lying face up on the floor of a small outbuilding situated approximately 95 feet northeast of the residence.

The outbuilding seems to have been used principally for the purpose of storing commercial fertilizer and farm equipment. There was an iron bed in the building which had been placed there some time previously for the use of defendant's son, Ollie. This bed, however, had been used occasionally by both the defendant and the deceased, and in one instance they slept there together. According to defendant, the deceased slept there alone only on occasions when the radio in the dwelling disturbed her. However, there was evidence for the State tending to show that the defendant sometimes slept in the outbuilding after a "row" with the deceased.

The legs of the deceased from her knees down to her feet were under the bed. Her body from the waist up was unclothed. There were bruises, cuts and abrasions all over the body of deceased, from her head to her feet. Her head was cut all the way to the skull, but the skull was not fractured. No bones were broken. There were imprints of teeth all over her breasts and on other parts of her body. Blood was in her hair. Her face was mashed in and her lower lip nearly cut off.

The cause of death was fixed at shock and loss of blood from the numerous wounds on her body.

The condition of the building indicated a terrific struggle. Blood was "spattered" over the floor and high up on the walls of

the building. Blood and long dark hair, of the color and texture of the hair of deceased, was all over the bedclothes and on the footrail of the bed. There were a number of little particles that appeared to be human flesh on the bedposts.

There was no indication of blood in the yard between the small outbuilding and the main residence.

The defendant was present when the investigating officers arrived at his home and he answered all questions propounded to him without reluctance. He denied any connection with the death of his wife. He did not appear to be excited to a great extent, but was nervous. He appeared to be sober, although there were indications that he was suffering from the after-effects of excessive drinking. He had on clean clothes. Without voicing any objection, he permitted the officers and members of the coroner's jury to examine his body for scratches and bruises. There are tendencies of the evidence which show that there were "fresh" scratches and bruises on his face and arms and one eye was black. However, there is evidence from witnesses for both the State and the defendant that the condition of his eye was the same as it was prior to the time of the death of his wife. There was evidence of the fact that the knuckles of his right hand were swollen. His hands appeared to have dried blood on them.

The officers made a thorough search of the main residence of the defendant. They found evidence of blood on the bedclothes of a bed which appeared to have been slept in the previous night. Under the bedclothes was a flashlight, upon which was found blood smears. Without protest from the defendant, they were permitted to examine a plastic belt which he was wearing, his billfold, and his shoes. There was a substance on each of these articles which appeared to be blood. At the request of the officers, the defendant gave them the key to a trunk which was located in the bedroom of the main residence. Upon opening the trunk, they found a pistol which had evidence of blood on it. Under the house a part of a hoe was found which had blood and human hair on it. The officers also found indications of blood on doorknobs and door handles in the main house.

The defendant was taken to jail some time between one and two o'clock. After arriving at the jail the defendant again denied any connection with the death of his wife. He permitted the sheriff to scrape his fingernails.

The articles which appeared to have blood on them and the fingernail scrapings were all forwarded to the State Toxicologist, who testified to the effect that blood was found on all of them. As to each article except one of the doorknobs and the fingernail "scrapings," he testified that the blood was that of a human being. There was insufficient blood on the doorknob and in the fingernail "scrapings" to determine whether it was the blood of a human being.

Sheriff Hyatt, a witness for the State, testified as to a conversation he had with the defendant in his jail cell on the afternoon of July 5, 1949. The defendant sent for the sheriff. He told the sheriff that he wanted to tell what happened. In this conversation the defendant said that he didn't remember anything that happened from the time his son Ollie brought him home and put him to bed on the night of July 3rd until around six or six-thirty on the morning of July 4th. After arising, he fed his stock. He then looked for his wife, Pearl. He found her body in the little outbuilding. He put his hand on her head and breasts and found that she was "cold." He found his hat lying on the floor near the foot of the bed. He took the hat back to his dwelling house and burned it in a "heater," along with the clothes which he had had on, which were "stiff." When the sheriff asked the defendant if he took out of the building the object with which he had "hit" the deceased, the defendant replied, "* * * No, he didn't hit her with anything but his fists." According to the sheriff, the defendant, in that conversation, told him "if I would look on her body I would probably find where she had been bitten all over," and that the deceased had bit him on his lower lip. On cross-examination, Sheriff Hyatt testified that in the conversation the defendant said that he was drunk all night and didn't know

what happened; that "I may have done it, but I don't know anything about it."

Proper predicate was laid for the introduction of evidence of incriminating statements of defendant.

Officers removed the contents of the heater in which defendant stated he had put his hat and clothes. A small piece of cloth was found, which the evidence shows was of the kind used in the making of men's trousers. It further appears from the evidence that the color of the clothing worn by defendant on the afternoon of July 3rd was similar to that of the piece of cloth.

The defendant testified in his own behalf. His version of the events of Sunday, July 3, 1949, is in accord with that already stated in this opinion up until the time he, the deceased, his son Ollie and George Twilley reached the latter's home. The defendant testified that they reached Twilley's home about five o'clock in the afternoon, where they took some drinks; that after taking the drinks at Twilley's he doesn't remember anything that transpired until he awoke on the following morning. He denied that there had been any trouble between him and his wife on Sunday. According to the defendant, after he awoke on the morning of July 4th he looked for his wife in their home and in the car. He then went to the little outbuilding, where he found her body. He put his hand on her head and found that she was "cold"; that while he was down over the body of his wife, his hat fell off and he picked up a flashlight which was lying by the side of his wife. He stayed in the building about five minutes and then went back to his house. When he got to his house he opened his trunk and put a knife in it. The pistol was lying in the trunk and he picked it up and emptied the shells into a cigar box, put the pistol back in the tray of the trunk, and then went in the kitchen and washed his hands. He saw that there was blood on his clothes and he put them and his hat in the heater and then put on clean clothing. He then proceeded to the home of George Twilley, where he told Twilley and his son, Ollie, of the death of his wife and asked that they notify the "law" and call an ambulance.

The defendant admitted that he summoned the sheriff to his jail cell on the afternoon of July 5th, but claimed that it was for the purpose of advising the sheriff as to the location of some whisky stills. He denied making any incriminating statements in his conversation with the sheriff, although he admitted that he told the sheriff that he had burned his hat and clothes. On cross-examination, it appears that the defendant found his hat on the floor of the building when he located the body of his wife, while, as above indicated, on direct he had testified that his hat fell off his head when he was bending over the body of his wife. He denied that he killed his wife or that he struck her with anything and said, "I don't remember a thing about it." On cross-examination he admitted that on one occasion during their married life his wife had had him arrested, but claimed that there had been no serious differences between them.

It is admitted, of course, that the evidence in this case shows that a crime had been committed. Counsel for the defendant contend, however, that the evidence was not sufficient to show that the defendant was the guilty agent. We cannot agree with this contention. We are clear to the conclusion that the circumstances of time, place, motive, means, opportunity, and conduct concur sufficiently to have authorized the jury to find that the defendant is the perpetrator of the acts of violence which caused the death of the deceased. Jarrell v. State, 251 Ala. 50, 36 So.2d 336, and cases cited.

It is next insisted by counsel for the appellant that even if it be found that the evidence is sufficient to support a finding that the defendant did bring about the death of his wife, that it is not sufficient to justify a verdict of murder in the first degree, and that the evidence shows that the defendant was so drunk as to have been incapable of forming a specific intent essential to a malicious killing or premeditation and deliberation essential to murder in the first degree.

Voluntary drunkenness neither excuses nor palliates crime. But in murder cases evidence of drunkenness to such de-

gree that the accused is incapable of rational action and hence incapable of forming a specific intent essential to a malicious killing may reduce the killing to manslaughter, or may negative the premeditation and deliberation essential to murder in the first degree, or reduce the crime to murder in the second degree. Ivory v. State, 237 Ala. 344, 186 So. 460; King v. State, 90 Ala. 612, 616, 8 So. 856.

■ The jury was instructed by the oral charge of the court and by special charges given at the request of the defendant as to this rule of law. The evidence of drunkenness in this case was sufficient to make an issue before the jury on this question.

■ Accordingly we hold that there was no reversible error in refusing to give the affirmative charges requested by the defendant as to the several degrees of homicide and in overruling the grounds of the motion for new trial which were predicated on the weight of the evidence.

■ Without objection on the part of the defendant, the State was permitted to show that the defendant carried a rifle with him on the morning of July 4th when he went to the home of George Twilley to tell him and Ollie Helms of the death of his wife. This fact was also brought out by counsel for the defendant on direct examination of the defendant. It is insisted here, however, that reversible error was committed by the trial court in permitting the State, over the objection of defendant, to show that the defendant, during the course of the investigation made at his home on the morning of July 4th, said that he carried the rifle because the hawks were eating up his chickens and he might have gotten a chance to kill one. We cannot see how the defendant could have been injured by this evidence. It was in effect a self-serving statement, explanatory of why he had a rifle in his possession on the morning after the homicide, and such statement did not in any wise tend to connect him with the offense with which he was charged. Conceding, without deciding, that the testimony was inadmissible, we will not predicate a reversal on its introduction in evidence. Supreme Court Rule 45, Code 1940, Tit. 7 Appendix.

Several witnesses were called by the defendant for the purpose of giving evidence as to his general reputation. Only three of them were shown to be competent witnesses in this respect. Two of the three witnesses who did testify that the defendant's general reputation in the community where he lived was good, were asked, in effect, on cross-examination as to whether or not they had ever heard that the defendant had been placed under bond to keep the peace. Only one of the witnesses answered and he denied having heard it.

■■ When a witness testifies as to the general reputation or character of defendant, it is competent on cross-examination to test the witness' knowledge of this reputation or character of which he did testify by asking if he had not heard of specific acts of the defendant that tend to militate against his reputation or character. Barnett v. State, 165 Ala. 59, 51 So. 299; Bell v. State, 170 Ala. 16, 54 So. 116; Hill v. State, 194 Ala. 11, 69 So. 941, 2 A.L.R. 509; Hill v. State, 210 Ala. 221, 97 So. 639; Vinson v. State, 247 Ala. 22, 22 So.2d 344; Wright v. State, 247 Ala. 180, 23 So.2d 519. In any event, the question was harmless in view of the negative answer. Hamlett v. State, 19 Ala.App. 218, 96 So. 371.

■ On cross-examination of the defendant, the State sought to elicit from him the fact that he had been placed under a peace bond. Objections interposed by the defendant were sustained. In this ruling the trial court was eminently correct. In Caldwell v. State, 160 Ala. 96, 99, 49 So. 679, 680, it was said: "The court erred in permitting the solicitor to examine the defendant in respect of difficulties he had previously had with named persons. These questions would have been permissible, if addressed to those of defendant's witnesses, who had testified to defendant's reputation for peace and quiet, but not so when propounded to defendant. Andrews v. State, 159 Ala. 14, 48 So. 858."

The State was not entitled to make such proof on the theory that it would tend to

affect the credibility of the defendant as a witness, for one who is required to give security to keep the peace is not convicted of any offense, much less one involving moral turpitude. Howard v. State, 121 Ala. 21, 25 So. 1000.

■ Although the trial court refused to permit the State to show on cross-examination of the defendant that he had been placed under a peace bond, it did permit the State on rebuttal to show by a justice of the peace of Cullman County that he placed the defendant under a $1,000 bond to keep the peace. This was over the objection of the defendant.

The trial court also permitted the State, over the strenuous objection of the defendant, to introduce the following documentary evidence:

"No. 2251    The State of Alabama
                    v.                   Charge
            L. M. Helms       Peace Proceedings
"Affidavit made and Warrant Issued to
    Bennie Brown Returnable 9 Oct 1948
Witnesses — for State      6 Witnesses

"Oct 9— 1948    On hearing the evidence the Court is satisfied of the guilt of the Defendant and awards the following punishment:

"The Defendant is placed under a $1000.00 peace Bond for a period of 12 months from this date.

"The Defendant makes said Bond with Fred Peinhardt and others as surety, and he is released.

"W. Marvin Scott, N.P. Ex Off J.P."

In permitting the introduction of this documentary evidence the record shows the following remarks of the trial court:

"It is not on the credibility of the witness; it is on the probative value of his reputation that he has put in issue.

*    *    *    *    *    *

"Overruled; and will allow it to be introduced to go only to the question of reputation, in rebuttal to the witnesses heretofore introduced by the defendant."

In permitting proof of the fact that the defendant had been placed under peace bond, in a proceeding with which the deceased was not shown to have been connected, the trial court committed reversible error.

■ The State, of course, had the right to rebut the evidence as to defendant's good reputation, but could not do so by proof of particular acts tending to show his bad conduct. Proof of general reputation alone is admissible. Andrews v. State, 159 Ala. 14, 48 So. 858; Smith v. State, 25 Ala.App. 79, 141 So. 265. The distinction between the right to cross-examine a witness who has testified as to the good reputation of the defendant as to whether or not he had heard of specific acts of misconduct on the part of the defendant and the proof of particular acts on direct examination is shown in the following language quoted from the opinion in the case of Andrews v. State, supra: "On cross-examination the state asked the witness Dr. Carter, who had testified to the good character of defendant, 'How many fights do you recall that he has had?' and he answered that he had heard of but two. The defendant objected to the question, and moved to exclude the answer, both of which were overruled. *While the character of a witness or of the defendant cannot be proved by particular acts, nor can the evidence of his good character be rebutted by proof of particular acts,* yet, for the purpose of testing the credibility or accuracy of the character witness, he may be asked, on cross-examination, whether or not he has heard of particular acts * * *." (Emphasis supplied.) 159 Ala. 25, 48 So. 862.

We now treat the charges requested by defendant and refused by the court.

■ Refused Charges 14, 16, and 54 were refused without error. They were substantially and fairly covered by the court's oral charge and written charges given at the request of the defendant. Without holding that said refused charges stated correct principles, their refusal does not constitute reversible error. § 273, Title 7, Code 1940.

Charge 18 is faulty in that it restricts the measure of proof required to convict the defendant to that furnished by the prosecution, instead of to the whole evidence in the case. In this case some of the criminating evidence was furnished by the defendant. Sanders v. State, 134 Ala. 74, 32 So. 654; Daniels v. State, 243 Ala. 675, 11 So.2d 756; Robinson v. State, 243 Ala. 684, 11 So.2d 732.

Charge 37 is argumentative and confusing. It was refused without error.

Refused Charge 46 is almost an exact duplicate of given Charge A–4. Hence, assuming, without deciding, that it states a correct principle, it was refused without error. § 273, Title 7, Code 1940.

Charge 51 requested by the defendant was properly refused on the authority of Lambert v. State, 234 Ala. 155, 174 So. 298. Charge 16 in that case was in the identical language of Charge 51 and it was held properly refused. Moreover, Charge 51 was fully covered by the court's oral charge and written charges given at the request of the defendant.

Charge 53 was refused without error. Similar charges have been held to have been properly refused in the following cases: Vaughn v. State, 130 Ala. 18, 30 So. 669; Spraggins v. State, 139 Ala. 93, 35 So. 1000; Tompkins v. State, 32 Ala. 569; Wharton v. State, 73 Ala. 366; Grant v. State, 97 Ala. 35, 11 So. 915.

It is strenuously insisted in brief filed here in behalf of the appellant that the trial court erred in refusing to grant a new trial on the ground that the jury had not been kept together while the case was in progress. We pretermit any discussion of this question because the judgment of the trial court must be reversed for the error heretofore pointed out.

The judgment of the trial court is reversed and the cause is remanded.

Reversed and remanded.

BROWN, FOSTER, and STAKELY, JJ., concur.