320 So.2d 742

Lawrence GREEN

v.

STATE.

4 Div. 358.

Court of Criminal Appeals of Alabama.

Aug. 19, 1975.

I. Edwin Moore, Montgomery, for appellant.

William J. Baxley, Atty. Gen., and David W. Clark, Asst. Atty. Gen., for the State.

HARRIS, Judge.

Appellant was convicted of murder in the second degree and sentenced to thirty years in the penitentiary. He was represented by retained counsel at arraignment and the trial in chief. He pleaded not guilty. After conviction he filed a motion for a new trial. Before this motion could be heard, new counsel was retained and he filed an amended motion for a new trial. No evidence was presented at the new trial hearing and the motion was overruled. Only legal arguments were made at the hearing and many of such arguments were dehors the record. At the conclusion of this hearing, it developed that appellant was indigent and the court ordered the court reporter to furnish him a transcript at the state's expense. Appellant's family made known to the court that they had arranged to pay counsel to represent him on appeal.

Omitting the formal parts the indictment reads as follows:

"The Grand Jury of said County charge that before the finding of this indictment: Lawrence Green. Whose name is to the Grand Jury otherwise unknown, unlawfully, and with malice aforthought (sic) killed Robert Lowery, Jr., by cutting or stabbing him with a knife or other sharp instrument, a better discription (sic) of which is to the Grand Jury unknown, but without premeditation or deliberation, against the peace and dignity of the State of Alabama."

Audrey Lowery, wife of the deceased, testified that on November 5, 1973, she and her husband were living in Ansley, Route 2, in the Shellhorn Community of Pike County, Alabama. She was at her mother's home around 4:00 p.m., when appellant, Willie James Green, and Lee Edward Williams came to her mother's house. They sat and talked for a while. They decided to go to a nearby store and buy some beer. Audrey rode in the car with appellant and Willie James Green. As they were going across the railroad tracks, they met her husband riding in a car driven by one William James Teague. They went to the store and bought a six-pack of beer and returned to her mother's house. Her mother told her that her husband had been there and gotten their little girl and left word for her to come home.

A short time later her husband arrived carrying a .22 rifle. She was in the car with appellant. Her husband walked up to the car and told her to get out. She got out of the car and her husband slapped her. Appellant came back and asked Audrey if her husband was angry because he had carried her to the store. Her husband and appellant started arguing. While they were arguing, Willie James Green and Lee Edward Williams came out and got in the argument. Appellant, Willie James and Lee Edwards all had open knives and they started backing the deceased down the road. They got the deceased down on the ground and started cutting or stabbing him. While the three men were down on the deceased, he managed to raise the rifle and fired one time. The shot killed Lee Edward Williams instantly. They got the rifle from the deceased who then walked into the woods. Audrey went into the woods trying to find her husband. She called him several times but he did not answer. She looked for him five to ten min-

utes and returned to her mother's house as the officers had arrived.

Mr. Presley Davis, the Sheriff of Pike County, testified that he got a call to go to the residence of Clara Berry in the Shellhorn Community around 8:00 o'clock that night while he was on his way home. He turned his car around and went to the Berry home. When he arrived he met the wife of the deceased and two men in a car. He was told that the deceased had shot and killed the Williams boy and had run into the woods. He called the coroner to come out and examine the body of Williams. He then called for the dogs the State owned. When the dogs arrived, they were let out the truck and found the body of the deceased about fifty yards from the truck. He called the coroner back to examine the deceased. When the coroner arrived, he put the body in an ambulance and carried it to Harrison's Funeral Home.

Dr. Richard A. Roper of the State Department of Toxicology and Criminal Investigation performed an autopsy on the bodies of both men who were killed on the night of November 5, 1973. His qualifications were proved and he testified that he had examined in excess of three hundred dead bodies. With respect to the body of Robert Lowery, Jr., he testified as follows:

"A   On examining the body of Robert Lowery Jr., I found a total of five clean-cut wounds. These consisted of a slit like—slit type of wound which was an inch in length on the front of the left shoulder and five inches left of the center line of the body, and an inch and a half below the shoulder which would put it in this area here on the body. The second was a clean slit like wound one half inch long and three and seven-eighths inches below the comminemim (sic) line and two and a half inches left of the mid line which would put it in approximately this area here on the body. The third was a superficial clean cut lacera-

tion one inch in length on the left side of the neck seven inches above the comminenim (sic) line and an inch and a half left of the mid line which would put it in the general vacinity (sic) here. The fourth wound was a clean cut laceration which measured three and a half inches in length by one inch in width. This was on the left side of the body six and one quarter inches left of the center line of the body of this line down here and four and a half inches above the comminenim line (sic) which would put this wound in this general area of the body. The fifth wound was a clean cut slit like wound about three eighths of an inch in length on the lower mid back, three eighths of an inch to the right of the center line of the back and thirteen inches below the top of the shoulder which would put it in the mid back approximately in this area here.

Q   How deep were those wounds?  I think you said some of them were penetrating type wounds?

A   Yes, Sir.

Q   Would you be able to determine the penetration?

A   The last three wounds which I described did not involve any major arteries or organs so, they just penetrated through the skin to the underlying muscles.

Q   Now, how about the other two?

A   After examining the body internally, I performed a disection (sic) of the chest and abdominal areas to examine the internal organs of the body. In doing this, I found a moderate of blood in the left side of the chest and a larger quantity of blood in a structure known as the pericardial sac which is just in essence a bag like thing which encloses the heart and separates it from the rest of the chest cavity. I found a hemmorhagic path to extend into the body cavity

from the wound in the lower anterior of the chest cavity. The wound here entered the chest cavity into the pericardial sac and into the chambers of the right ventrical into the opening of the right side of the heart. The second path was traced from the first wound which I described, the wound in the left shoulder, this wound went into the muscles tissue of the shoulder and into the—the subclavical artery which is the artery which goes across the shoulder and into the arm.

Q All right. Based on your examination of the body of Robert Lowery, Jr., and on your ·findings at that examination, did you arrive or do you have an opinion as to the cause of death?

A Yes, Sir. I do.

Q What is that Sir?

A Based on my examination, I concluded the death resulted from hemmorhage and shock associated with multiple stab wounds of the body in which the body and heart were penetrated.

Q Dr., were these wounds—you said multiple stab wounds, could you determine yourself from the examination what the weapon was that was used to inflict those wounds?

A Based on my belief and opinion to the type?

Q Yes, Sir. Would you state that please?

A I concluded that the instrument used was a knife or knife like object.

Q A knife like object? Would that be a sharp instrument? Is that what you are saying in essence?

A Yes, Sir."

Sgt. B. J. Gatland who was employed as a State Criminal Investigator with the Alabama Department of Public Safety, testified that he arrived in Troy, Alabama, on November 5, 1973, at approximately 8:30 p. m. and went directly to Harrison Funeral Home; that on November 6, 1973, he interviewed appellant at the Sheriff's office in the courthouse. Present at this interview were appellant, Sheriff Davis and Deputy Sheriff Ed Taylor. At this point a voir dire examination was conducted out of the presence and hearing of the jury.

At this hearing Gatland testified that he gave appellant the *Miranda* rights and warnings, that he gave him a waiver of counsel form and appellant read it and said he understood it. To be sure appellant understood the contents of the form Gatland read it to him again and he said he understood his rights and signed his name to the waiver form. He then told Gatland he wanted to make a statement. Gatland wrote the statement down just as the appellant related his participation in the killing of Robert Lowery, Jr. Gatland further testified that neither he or anyone in his presence or hearing offered appellant any hope or reward or promises or any inducement to get him to make a statement, that no one threatened him in any way, or physically abused him in any way to get him to make a statement.

Appellant testified at the voir dire hearing but not during the trial in chief before the jury. He testified that he was twenty-six years of age and went to the sixth grade and that he could read and write. He admitted he read the waiver of counsel form and that Mr. Gatland also read it to him and he signed it. He said he understood most of the language in the form but there were some words that he did not understand.

At the conclusion of his hearing, the court ruled that appellant knowingly and understandingly executed the waiver of counsel form and voluntarily signed it with full knowledge of its contents.

The jury was returned to the courtroom and after the proper predicates were laid, the *Miranda* card was read to the jury and

the waiver of counsel form was introduced in evidence, and the statement that appellant gave Mr. Gatland was read to the jury. This statement is as follows:

"On Monday, November 5, 1973, at about 4 o'clock p. m., I went to Clara Berry's house. My brother Samual Green brought another car and followed me over there. We went inside and drank some beer with Clara, Audrey Lowery, and Bobo Cannon. About 20 minutes after we got there, another brother, Willie James Green and Lee Edward Williams, my brother-in-law, Jimmie Foster, drove up to Clara's house. About 20 minutes after that came, me and Willie James took Audrey Lowery to the store that used to be Adam's store, for some beer. On the way to the store we saw Audrey's husband, Robert Lowery. I asked Audrey if she wanted to go back. She said no. Go on to the store. We went on the store where Audrey bought a 6-pack of beer. We then went back to Clara's house. About 15 minutes after we got back to Clara's house Audrey asked me to take her home. We both went to my car and got in when Robert walked up with the rifle. It was pointed down at the ground. I asked him what he meant. I haven't did nothing. He did not say anything to me. He walked to the other side of the car, got Audrey out and started slapping her. Me, Willie James and Lee Edward Williams started at him. He started backing down the road. I had my knife out. I don't know if Lee Edward or Willie James had their knife out or not. We backed him down the road about 40 feet when he shot Lee Edward Williams. He then started running. Me and Willie James cought (sic) him, took the rifle away from him and I know I stuck him at least once with my knife in the chest. Willie James was hitting him, but I don't know if he had a knife or not. Audrey was close enough to us to see us whipping him. I don't know if she saw us whipping him or not. Signed Lawrence Green and Presley Davis."

Appellant did not testify nor did he offer any evidence in his behalf. The evidence for the state was uncontradicted.

There was no motion to exclude the state's evidence; there was no request for the affirmative charge; no exceptions were reserved to the court's oral charge to the jury and though a motion for a new trial was filed, absolutely no testimony was offered at the hearing on such motion. In this state of the record the sufficiency of the evidence is not presented to this court for review.

A verdict of guilty of murder in the second degree was not so contrary to the great weight of the evidence as to put the trial court in error for refusing to grant a new trial. *Colvin v. State,* 39 Ala.App. 355, 102 So.2d 911.

A decision on motion for a new trial rests largely within the sound discretion of the trial court and, in reviewing that decision, the Court of Criminal Appeals will indulge every presumption in favor of the correction thereof. *Moore v. State,* 52 Ala.App. 179, 290 So.2d 246; *Hamm v. State,* 38 Ala.App. 423, 87 So.2d 863, affirmed, 264 Ala. 366, 87 So.2d 865.

The corpus delicti may be proved by circumstantial as well as by direct evidence, and where there are facts introduced from which inferences of guilt may be legally drawn, it is a question for the jury as to whether the corpus delicti has been proved. *Zeigler v. State,* 52 Ala.App. 501, 294 So.2d 468.

In *Bridges v. State,* 284 Ala. 412, 225 So.2d 821, the Supreme Court said:

"The rule is clearly established in this State that a verdict of conviction should not be set aside on the ground of the insufficiency of the evidence to sustain the verdict, unless, after allowing all

reasonable presumptions of its correctness, the preponderance of the evidence against the verdict is so decided as to clearly convince the court that it was wrong and unjust. *Cobb v. Malone*, 92 Ala. 630, 9 So. 738; *Stewart v. State*, 38 Ala.App. 365, 84 So.2d 658; *Evans v. State*, 39 Ala.App. 404, 103 So.2d 40, cert. denied 267 Ala. 695, 103 So.2d 44; *Jones v. State*, 40 Ala.App. 419, 114 So.2d 575."

We cannot say that the verdict in this case is so patently against the weight of the evidence as to convince us that it was wrong and unjust.

We have carefully searched the record for errors injuriously affecting the substantial rights of appellant and have found none.

This case is affirmed.

Affirmed.

All the Judges concur, except CATES, P. J., not sitting.