Appellant was convicted of murder in the first degree and sentenced to life imprisonment in the penitentiary. Throughout the trial proceedings appellant was represented by court-appointed counsel and at arraignment he pleaded not guilty. He is in this court with a free transcript and trial counsel was appointed to represent him on appeal.
On February 28, 1976, around 3:00 or 3:30 a.m., two black females, Diane Pettaway and the deceased, Annie Ruth Holcombe, were walking on Stone Street in the City and County of Mobile, Alabama, when a white 1968 model Ford automobile occupied by two men passed the women. One of the men in the car asked the women what was going on and the deceased asked the men to give them a ride to the Amvets Club. The man driving the car turned around and picked up the women. The women got in the back seat. The deceased got in the car first and Diane got in behind her. It was a four-door automobile and the women sat close to each other behind the passenger in the front seat. The passenger who was later identified as the appellant turned around and asked the girls in the back seat if they wanted a reefer, and Diane responded that they did not smoke. The driver kept driving and the passenger turned around to the girls and said something to them and at this time Diane got another look at the passenger's face and a side view of his profile. It soon became obvious that the men were not going to carry the women to the Amvets Club and they told the driver to stop the car. The driver was meeting another car and said he would stop as soon as the other car passed. When the approaching car passed the driver did not stop and the girls opened the car door on the passenger's side and jumped out of the moving car and started running. The man *Page 511 
on the passenger's side got out of the car and started chasing the deceased, Annie Ruth Holcombe. Diane ran to the corner of Chinquepin Street and knocked on the door, but no one came to the door. She looked back and saw that the man chasing the deceased was overtaking her. Diane heard one shot as she was running to the next house. The last house was vacant and Diane ran into a field and lay down until she heard the Ford leave. She stated the car had a loud muffler and she could tell when it left the scene. She also stated that the car had bucket seats and there was a white stick between the bucket seats. She asked the men what the stick was for and they said they had to use it to keep the hood of the car raised up.
After the white Ford left the scene, Diane went to the Amvets Club to get Annie Ruth Holcombe's brother and she told him what had happened. Diane and the brother of the deceased went back to the scene and found a hat that Diane said looked like the one the male passenger was wearing at the time he turned around to talk to the two girls in the back seat of the car. When they got back to the scene, they could not find Annie Ruth Holcombe. Diane made a positive in-court identification of appellant as the man riding on the passenger's side of the car before the girls jumped out of the car. Diane heard the shot but she did not see who fired the shot. Diane attended a lineup a few days later and identified appellant as the man who got out of the car and chased Annie Ruth. Appellant was the number six (6) man in the lineup.
Diane further testified that there were two other men in the lineup that she had seen previously but she did not know their names. Diane was subjected to a thorough and vigorous cross-examination but she was not shaken in her identification of appellant as the man who was chasing the deceased at the time she heard a shot and the last time she saw Annie Ruth alive. Diane did not tell the officers who conducted the lineup that there were two men in the line that she had previously known. She positively identified appellant and left.
Ms. Shirley Evans testified that she lived at 1364 Chinquepin, Apartment 2, on February 28, 1976. She said that around 3:30 to 4:00 on that morning she was in bed and she heard some noises and got up. She went to the kitchen and looked out the window and didn't see anything and started back to her bedroom when she heard a shot. She went back to the kitchen window and saw a woman running and a man behind her, and she heard a shot. She heard a woman saying, "Don't hit me again," and the girl made this statement after she heard the shot. Later she heard another shot. She further testified that she observed the woman stop running and that is when she was shot. There was only one man present with this woman. She stated that a few minutes later someone in a small white Ford automobile drove up and she thought it was a 1968 Galaxie and that the right taillight was out. She said that after the man shot the woman she fell and he stood over her straddling. As soon as the white Ford approached the place where the woman was lying the man who had shot her picked her up and put her in the back seat of the Ford and they left the scene of the shooting. She further testified that she noticed that the car had a loud muffler. She did not know who the girl was, nor did she recognize the man that shot her.
Charles Benning, Sr., testified that around 4 o'clock on the morning of February 28, 1976, he was in the bathroom of his home located on Chinquepin Street and he looked out the bathroom window and saw a man and woman standing in the street. He heard a gunshot and the woman fell. He further testified that at this time a white 1968 Ford with a loud muffler came around the corner. The man who shot the woman put her in the back seat of the car and the car left the scene. He also testified that the taillight on the right rear of the Ford was out.
Another witness Ms. Venessa Ball testified that on the morning of February 28, around 4:00, she was in bed asleep; that she lived at 1303 Morgan Street, Apartment B, in the City of Mobile. She stated that she *Page 512 
was awakened by a lady knocking on the window saying, "Help, I have been shot." She got out of bed and got her brother and sister up and then her mother woke up and asked what was going on. She said the woman that was knocking on the window and hollering for help, that she had been shot, had her hands on the window and her hands were sliding down and she fell outside the window. She said she did not get a good look at her face but she knew she had on a black blouse. She further testified that Morgan Street was about a mile from Chinquepin and Titi Streets. After being convinced that the woman had been shot they called the Police Department.
Mrs. Lillie Bea Ball testified that she lived at 303, Apartment B, Morgan Street in the City of Mobile which was approximately one mile from Chinquepin and Titi Streets and that in her judgment it would take about ten minutes driving time to reach Morgan Street from Chinquepin and Titi. She said her daughter waked up and told her that there was a woman knocking at the window saying she had been shot and she was dying. She got up and saw the woman and called the Police Department. She was shown State's Exhibits 9 and 10 which were photographs of the deceased woman and she identified these photographs as the woman who was knocking on her window. These photographs were admitted into evidence over objection of appellant. Mrs. Ball identified the deceased woman as being Annie Ruth Holcombe.
John Joseph Wynne testified that he worked for the Police Department of the City of Mobile and that in the early morning hours of February 28, 1976, he was sent to Morgan Street to investigate a report that a person had been shot. He testified that when he arrived at the address on Morgan Street he observed a person lying on the ground just outside the window, that he pulled his car in the drive and put his headlights on the person and it was a black female in her twenties, in his best judgment. He stated that her pants and underclothing had been pulled down to her ankles and he thought off one leg. He testified that he was not sure about the top half of her clothing; that he observed what appeared to be a hole in her left chest that was a small hole.
Officer Wynne was shown State's Exhibits 9 and 10 and stated that he recognized these photographs as being of the woman that he found outside the window on Morgan Street with a bullet hole in her left chest.
He stated that the woman was not dead when he arrived at the scene as she was moving a little. He stated that he summoned the ambulance and rode to the hospital in the ambulance with the woman but he thought that she was dead before the ambulance arrived. He further testified that there appeared to be powder burns in the area of the bullet hole in the woman's left breast.
Officer Billy McGill of the Mobile Police Department testified that on February 28, 1976, at 4 o'clock in the morning he received a call to go to Morgan Street and that when he arrived there he saw a black female between 27 and 29 years of age; that he asked the people in the house to get him a blanket to put over her. He felt her pulse and her pulse was very weak. He said that he knew she was alive at that time but she was in extremis.
Officer McGill asked her who shot her and she tried to tell him but she couldn't make a sound. He said the only thing that he could understand her to say was that she was dying.
Ike Clemons testified that he owned a 1968 four-door Ford Custom automobile. He identified State's Exhibits 3, 4 and 5 as being photographs of his car. He said he knew one Ralph Creer and had seen Creer and appellant together four or five times. He stated that on the day in question he went to Ralph Creer's house. This was on the night of February 27; that from Creer's house he and Creer and one George Rembert got in his car and drove back to Clemons' house. They sat around Clemons' house and drank beer before he had to go to work; that Creer asked him if he could use his car and he told him he could use it, *Page 513 
provided he brought it back at the time he got off work; that he got off work at 2:00 a.m. on February 28, but Creer did not bring his car back until between 10 and 11 o'clock the next morning. When he got his car back, he found a woman's shoe in the back seat and he stated that Creer threw that shoe in a ditch. He further testified that there was a short in the right rear taillight and that when he would put a new light bulb in, it would burn for a few seconds and then go out. He stated that there was a stick that he kept in the car which was necessary to hold the hood up when he needed to look at the motor; that this white stick was kept between the bucket seats in his car. He stated that when he bought the car, it did not have bucket seats but he put bucket seats in the car. He further testified that he found a silver earring on the front floorboard of the car after Creer returned it and that he took it and threw it in the back seat of the car where it was later found by the police officers. He further testified that he had not seen Creer since he returned his car to him on February 28 and that he had not seen Rembert since the preliminary hearing that was had in this case.
Joe Connick testified that on February 28, 1976, he was a Detective Sergeant with the Mobile Police Department and that he arrested appellant on March 9, 1976. He said that he and his partner, Officer Bell, were investigating the death of Annie Ruth Holcombe, and in the course of their investigation they found George Rembert and they questioned him about the death of Annie Ruth Holcombe, and Rembert suggested to the officers that they locate appellant and talk to him and that Rembert carried the officers to the home of appellant. He further testified that when he arrested the appellant at home, he gave him theMiranda rights and warnings and that when they got to the Police Headquarters, appellant signed a consent form to be placed in a lineup. He was advised that he could have an attorney present at the lineup but he signed a waiver stating that it was not necessary for an attorney to be present and to go forward with the lineup. This witness further testified that he had not seen Rembert since the preliminary hearing conducted in this case.
Dr. Earl Wert testified that he was a licensed medical doctor and was Coroner for Mobile County and that he had been practicing his profession since 1940. He further testified that during the time he had been Coroner he had performed autopsies on roughly 400 bodies a year. He identified State's Exhibits 9 and 10 as being the woman on whom he performed an autopsy on the 28th day of February, 1976. He testified that he noticed a bullet hole in the left chest of the deceased and that this was made by a small caliber bullet that entered the left lung and went through the vertebra in the back. He stated that the cause of death was attributed to a gunshot wound in the left lung and vertebra with severe hemorrhage.
On cross-examination Dr. Wert stated that the bullet was lodged in the fracia which is a gristle-like material of the muscle and bone beneath the skin of the back and that it had penetrated the lung and the vertebra. He stated that in his opinion the victim had been shot from the side and not from the rear.
It is not clear from Dr. Wert's testimony that he recovered the spent bullet from the body of the deceased though there is a strong inference from his testimony that he did so recover the bullet. However, if he did recover the bullet the record does not show to whom he gave the spent bullet.
When the State rested, appellant moved to exclude the State's evidence on the ground that there was not sufficient evidence to submit the case to the jury on the question of guilt vel non of appellant. He further stated in his motion to exclude that the State's main witness and only witness as to identification of appellant was in the back seat of the car and it was night and she did not get a clear view of the face of appellant and that her identification was very weak. The motion to exclude was overruled and denied by the trial court.
Appellant did not testify but he offered his mother as a witness in support of his *Page 514 
alibi. She testified that she did not know what time her son left home on the afternoon or evening of the 27th of February, 1976, but she knew that he came home between 2:30 and 3:00. She did not see him when he came home but she heard him talking to the other children in the house. She stated that she was positive that it was between 2:30 and 3:00 when he came home and that she heard that this woman had been killed at 4:00 that morning, and she knew her son was not involved because he was in her home.
She said that the next time she saw her son was at 6 o'clock on the morning of February 28, when she awakened him.
We agree with appellant that the testimony of Diane Pettaway was extremely weak but the jury believed her testimony. The trial judge heard and observed her testify on the motion to suppress and on the trial in chief. When appellant filed his motion for a new trial, he made a strong argument on the weakness of her testimony. The trial judge felt that her testimony was strong enough to submit the case to the jury and that the verdict of the jury should not be disturbed.
The trial judge and the jury also heard the alibi testimony of appellant's mother and decided that Pettaway's testimony was much more credible.
We have held many times that in reviewing the refusal of a motion for a new trial this Court will indulge every presumption in favor of the correctness of the ruling of the trial court and a decision thereon rests largely within the discretion of the trial court. Clark v. State, 54 Ala. App. 217,307 So.2d 28; Green v. State, 56 Ala. App. 229, 320 So.2d 742.
Conflicting testimony is for the jury and a verdict rendered thereon will not be disturbed on appeal. Waters v. State,55 Ala. App. 646, 318 So.2d 342 Pugh v. State, 51 Ala. App. 164,283 So.2d 616.
It is not within the province of this Court to pass judgment on the truthfulness or falsity of conflicting evidence. Snipesv. State, 50 Ala. App. 139, 277 So.2d 413.
Where there is legal evidence from which the jury can by fair inference find the accused guilty, this Court has no right to disturb the verdict. Whether there is such evidence is a question of law, its weight and probative value are for the jury. Rider v. State, 56 Ala. App. 137, 319 So.2d 756; Simms v.State, 56 Ala. App. 156, 320 So.2d 89.
The totality of the circumstances surrounding the pretrial lineup was not so unduly suggestive as to render evidence of lineup and in-court identifications inadmissible. Coleman v.Alabama, 399 U.S. 1, 90 S.Ct. 1999, 26 L.Ed.2d 387; Havard v.State, 50 Ala. App. 147, 277 So.2d 421.
In this case the mere fact that Diane Pettaway saw the faces of two men that she had seen some time in the past, and she did not know their names, and more importantly she did not tell the officers that she had previously seen these two men before, did not render the lineup identification so unduly suggestive as to violate any of appellant's constitutional rights. She identified appellant in the lineup based upon the fact that she saw his face on two occasions while riding in the automobile with him. Her identification of appellant was prompt and unequivocal.
Appellant contends that the trial court committed reversible error in denying him a new trial on the ground of newly discovered evidence.
In Taylor v. State, 266 Ala. 618, 97 So.2d 802, the Supreme Court held:
 "To establish his right to a new trial on the ground of newly discovered evidence the defendant must meet the following requirements: (1) that the evidence is such as will probably change the result if a new trial is granted; (2) that it has been discovered since the trial; (3) that it could not have been discovered before the trial by the exercise of due diligence; (4) that it is material to the issue and (5) that it is not merely cumulative or impeaching."
At the hearing on the motion for a new trial appellant's counsel made the following *Page 515 
statement to the Court in the form of a showing as to Police Officer Sam McLarty:
 "Officer McLarty informed me that at the time the case was tried — and it was not known to us, and I do not think it was really made available to the District Attorney, I am not sure — they had located and found the murder weapon in this case and the murder weapon was a gun — hand gun, and that ballistics tests had been run on the gun and it had been identified as the gun that killed Annie Holcombe. The gun was found by an officer who was either suspended or is not on the force at this time — I am not sure (unintelligible), in a nightclub in the area or vicinity in which this crime occurred behind a juke box, and further with that had found a hat similar to the kind identified and described by the State's witness."
The record shows that appellant was found guilty on June 23, 1976, and the motion for a new trial was filed on July 15, 1976, and was continued from time to time until November 4, 1976, at which time the motion was overruled and denied.
It thus appears that appellant's counsel had more than three months after appellant's conviction to locate the death weapon and trace the chain of possession from the officer who allegedly found it to the ballistics expert who test-fired the weapon and made a comparison with the slug, if any, removed from the body of the deceased, and rendered his opinion that the slug from the body of the deceased was fired from that particular weapon. And, too, there was time to determine if the death weapon had any fingerprints pointing to the slayer. Absent any fingerprints of someone other than appellant there would have been no evidence that appellant did not fire the fatal shot and hide the weapon himself. All of this could have been adduced in the form of testimony on the hearing of the motion for a new trial and this was the time to have done so.
We agree with the trial judge that in the present state of the record the motion for a new trial was properly overruled.
We have carefully searched the record for errors injuriously affecting the substantial rights of appellant and have found none.
The State's evidence was sufficient to support the judgment of conviction and the case is due to be affirmed.
AFFIRMED.
All the Judges concur.