HARRIS, Presiding Judge.
Appellants, who are identical twins, were separately indicted for murder in the first degree involving the death of Dennis By-num in Blount County, Alabama. They were represented by court-appointed counsel at arraignment and pleaded not guilty. Prior to trial it was made known to the Court that the family of appellants had employed Honorable Robert C. Sutton of the Birmingham Bar to represent them. By agreement of the parties the cases were consolidated for trial. The jury returned a verdict finding appellants guilty of murder in the first degree and fixed their sentences at life imprisonment in the penitentiary. After the sentences were imposed, they each gave notice of appeal and requested a free transcript. A free transcript was furnished appellants and trial counsel represents them on appeal.
The victim of this crime owned and operated a combination grocery store and gas station north of Oneonta, Alabama on Highway 75. He was sixty-six years old.
Mr. Bynum and his wife had breakfast together on the morning of March 24, 1976. He left to open his store and 6:15 that morning. This store was just across the road from the Bynum’s house. Mrs. Bynum testified that when he left the house, Mr. Bynum carried a greenish-gray tackle box in which he had “in the neighborhood of five or six hundred dollars.” She further stated the box also had some silver they used to make change. This was the last time Mrs. Bynum saw her husband alive. On the afternoon of March 25, 1976, Mrs. Bynum saw her husband’s body at King Funeral Home.
Doris Long testified that on March 24, 1976 she was employed by the Oneonta Police Department as the Radio Dispatcher. On that day, Mrs. Long stated, she received a phone call from Dennis Bynum at 9:07 a. m. Mr. Bynum told Mrs. Long that he operated a service station on Highway 75 East and asked that an ambulance be sent there. Mrs. Long asked Mr. Bynum “what the trouble was” there and Bynum replied that he had been robbed and stabbed by two black men, who were driving a “light two-tone late model Chevrolet car which had a Jefferson County tag; and the numbers . . was 4261.” When asked by Long for a description of the two men, Bynum said, “Lady, Please send that ambulance, I’m hurt real bad.”
She further testified that Chief Earl For-tenberry of the Oneonta Police Department was present when she received the call from Mr. Bynum and he called the ambulance.
Earl Fortenberry testified that he was Chief of the Oneonta Police Department on March 24, 1976. He stated that he was present at the station when the call from Mr. Bynum was received. Fortenberry testified further that he arrived at Bynum’s station at 9:16 a. m. At this time Bynum was still alive, slumped in a chair near the cash register. Mr. Bynum told Fortenberry that he had been robbed and stabbed by “two colored men,” and they were traveling in a light tan Chevrolet with a Jefferson County tag. Fortenberry testified that By-num then appeared to go into deep shock.
According to Fortenberry there was a great amount of blood about the interior of the store. The drawer of the cash register was open and empty with the exception of some loose change. The door of the store was open. Chief Fortenberry said that a tackle box was not found in the store. He further testified that the station was locked by Gerald Maynor, Bynum’s son-in-law, at the direction of the officers.
*730 Gerald Maynor testified that he was Dennis Bynum’s son-in-law. At about a quarter till nine a. m. on March 24,1976, Maynor stopped in at Bynum’s Store to visit. Maynor testified that he remained at the store, talking with Bynum until nine o’clock that morning.
Maynor stated that Bynum kept his charge tickets and money in a green tackle box. Maynor saw this box on March 24, 1976, while visiting his father-in-law. By-num took the box from underneath the counter to pay a milkman, and then put it back under the counter. Maynor testified that he did not notice a light tan Chevrolet as he was leaving the station that morning to go on his mail route.
About 9:20, Maynor received word that something had happened to Bynum. He stated that he then returned to the store. There he discovered that Bynum had already been taken to the hospital. Maynor testified that he locked the store in the presence of law enforcement officers. At noon, Maynor testified, he unlocked the store so that news media personnel could film the interior of the store. These cameramen did not go inside the store.
J. C. Carr testified that he was Sheriff of Blount County in March of 1976. Carr stated that, upon receiving a report of an incident at Bynum’s Store, he went to the emergency room of Blount Memorial Hospital. There he learned that Bynum was dead. Carr observed six stab wounds on Bynum’s body — three in front and three in back. Carr testified that he was present at Bynum’s store when Maynor locked it and that he returned to the store that night about ten o’clock. He was accompanied by Johnny Nesmith and Bob Hancock, both Sergeants with the Alabama Bureau of Investigation, and Buddy Howell, a Fingerprint Technician with the Jefferson County Sheriff’s Office. These three men “processed” the crime scene. Photographs were taken and fingerprints lifted. The photographs of the entire scene were introduced into evidence without objections.
Buddy Howell testified that he was employed by the Sheriff’s Office of Jefferson County as an Evidence Technician. Howell had been employed in that capacity for two years at the time of the trial. For six years previous to his present employment, Howell was employed by the City of Birmingham Police Department, as an Evidence Technician for three years. Howell also stated that he had attended the FBI’s latent fingerprint and photography school at Quanti-co, Virginia and that he worked for the FBI a year as a fingerprint technician.
On March 24, 1976, Howell testified, he investigated the scene of Bynum’s murder. There, Howell fingerprinted the store from “one end to the other,” lifting numerous prints. Howell explained the process of taking prints and stated that it took at least seven “points” to identify a print as belonging to a particular person.
Howell testified that a print lifted at Bynum’s Store was that of appellant Sammie Lee Jones. This print was lifted from the outside door of the store. When Howell first compared the latent print with the sample taken from Sammie Lee Jones, he found six points of identification. Subsequently Howell discovered three more points.
James Alfred Dunn testified that he resided in Cleveland in Blount County. On March 24, 1976, Dunn was employed by the Oneonta Police Department. He testified that he worked on the Bynum investigation and that on June 16,1976 he had occasion to be in Birmingham, Alabama.
Dunn had previously viewed two composite drawings of suspects in the Bynum case. These drawings had been made by a lab technician for the Police Department and by Phillip Duke. While in the Jefferson County Courthouse, Dunn saw someone resembling the person portrayed in the composites. He discovered that the person he saw at the courthouse was Jimmie Lee Jones. When asked to point out the person he had seen in Birmingham, Dunn stated it was hard to say and then noted that the two defendants were twins.
Phillip Roger Duke testified that on March 24, 1976 he resided in Oneonta, Ala *731 bama. Duke stated that he passed Bynum s Store every day. On his way to work that morning, Duke stated, he passed a tan automobile with a white or off-white top. This car was “just north” of Mr. Bynum’s store. Duke stated it was approximately 7:20 that morning when he observed the car. As the automobile passed him from the opposite direction, Duke looked at the driver of the car. He identified the driver as being one of the appellants. Subsequent to Bynum’s death, Duke drew a sketch of the man he had seen. He also examined between fifty and a hundred photographs, from which he picked two photographs that looked to him most like the driver of the car. These photographs were of the appellants.
Cecil Mangrum testified that he lived in Sneads Crossing in Blount County. On March 24, 1976, about nine o’clock in the morning, Mangrum and his wife were on their way to Blount Memorial Hospital to visit a friend. Two or three miles north of Bynum’s Store, Mangrum came up behind a car going at a slow rate of speed. Mang-rum passed this car shortly before Bynum’s Store. His wife noted that the car was from Jefferson County. As Mangrum passed the car, he got a look at the driver whom he identified as being one of the appellants.
Mangrum further testified that he later attended a lineup at the North Birmingham Jail. There, Mangrum identified Jimmie Lee Jones as the driver of the car. However, Mangrum was not positive in his identification, but testified that in his best judgment the driver was Jimmie Lee Jones.
Bill Young testified that he resided on Oneonta in Blount County, where he owned and operated a cycle shop. This shop was between a quarter mile and a half mile from Bynum’s Store. Young stated that a few minutes before nine o’clock on March 24, 1976, a beige 1971 Chevrolet two-door pulled up in front of the cycle shop. Two black males were in the car. These men parked the car, sat there three to four minutes and then pulled back on the highway, headed north in the direction of By-num’s Store. Young could not identify the occupants of the car. He did notice that the car had a Jefferson County tag.
Marvin Eugene Parrish testified that he lived in Oneonta, Alabama. On March 24, 1976 around nine o’clock Parrish was driving past Bynum’s Store, when a car turned across the lane in front of him and pulled into the service station. Parrish noticed that the occupants of the car were two black men with “Afros.” The car was a 68-70 gold Chevrolet. Parrish could not identify the occupants of the car.
Selman Morgan Knight testified he was an officer of the Birmingham Police Department. Knight testified that he knew both appellants and that he participated in their arrest on August 23, 1976. Knight, Sergeant Swatch of the Sheriff’s Office, and Sergeant Jones of the Birmingham Police Department located Jimmie Lee Jones in the 600 block of 32nd Street South in Birmingham. When Knight told him they were looking for Sammie and why they were looking for him, Jimmie Lee responded that he had never been in Blount County-
Knight recounted that Sammie Lee was arrested the following day.
From the record:
“Q. And tell the jury what, if anything, you said and what, if anything, he said— Sammie Lee Jones — at the time he was arrested?
“A. Yes, sir. We got out of the car and took hold of Sammie Jones by both arms and told him he was under arrest for robbery and murder.
“He asked, ‘Where?’ and I said, ‘Blount County.’ He said something — I don’t remember the exact words- — but, in substance, about his brother already had been picked up; and that neither of them had ever been in Blount County.
“Q. That neither one of them had ever been in Blount County?
“A. Yes, sir.
“MR. BAINS: That’s all.”
Thomas Swatch testified in substantially the same manner as Knight. He testified additionally, however, that appellants on *732 different occasions told him “four or five different places they were supposed to have been.” None of these alibis checked out to be accurate.
Thomas Eugene Brown testified that he was incarcerated in the Blount County Jail and present when Sammie Lee Jones was “brought in.” Brown stated that he became aware of the charge against Sammie the day they were in the “bullpen.” This, Brown explained, is “a place where they carry you to take a shower and stuff like that.”
From the record:
“Q. Tell us in your own words, Thomas, what that conversation was.
“A. Well, I was telling Sammie about my case. I didn’t tell him the full details about it; and then he started telling me about this old man he had killed up here at the service station. And I said—
“Q. Is that the way he described it?
“A. Yes, sir.
“Q. The old man up at the service station?
“A. Yes, sir.
“Q. All right. Go ahead.
“A. He says, ‘My brother went in there to pay for some gas, and I walked in behind him.’ And his brother . he said he was holding him up and getting the money. And he said he just went wild when he seen the money, and pulled a knife and started stabbing the man.
“Q. Now, who did he have reference to as going wild?
“A. Sammie said he went wild. Sammie went wild.
“Q. Sammie went wild?
“A. Right.”
Further:
“Q. Now, during that conversation in that bullpen with Sammie Jones, did he mention a box to you?
“A. Yes, sir.
“Q. What kind of a box did he mention?
“A. A little green metal box.
“Q. Did he describe it to you?
“A. He showed me the length of it and all.
“Q. Well, show us that he did.
“A. He said it was about so high, and so wide. (Indicating with his hands.)
“Q. And what was the conversation in regard to that little green metal box?
“A. Sammie said he got it behind the desk ... at the desk at the station . the counter at the station . service station.
“Q. Got it behind the counter?
“A. Yes, sir.
“Q. All right. Go ahead.
“A. And he said he left the service station . . . him and his brother— Sammie and Jimmie — left the service station and went to Birmingham.
“Q. They left there on this particular day we’re talking about and went to Birmingham?
“A. Yes, sir.
“Q. Now, was there any mention of any money or anything?
“A. Yes, sir.
“Q. What was the discussion about money?
“A. He said there was . . . Sammie said there was approximately around six hundred dollars in the little box.
“Q. Talking about the little green box?
“A. Yes, sir.
“Q. Did they say whether they took the green box with them or not?
“A. Yes, sir.”
James M. Buttram testified that he conducted a post-morten examination of Dennis Bynum’s body, in his capacity as Director of the Laboratory for the Alabama Department of Toxicology. Defense counsel stipulated to Buttram’s qualifications. During the course of examination, Buttram observed “numerous penetrating wounds in the skin,” which he testified represented stab wounds. The locations of these wounds were left front chest, right front chest, left back, right back, left shoulder, left upper arm. Two of these wounds pierced the heart and liver, resulting in extensive internal bleeding. Buttram determined that Bynum’s cause of death was *733 hemorrhage, in particular cardiac tampi-nade. This condition occurs where blood rapidly fills the pericardial sac surrounding the heart, which results in exertion of pressure on the heart. This pressure prevents the heart from filling with blood. In But-tram’s opinion either the wound which penetrated the heart or the wound which penetrated the liver would have been fatal. Buttram concluded that these stab wounds were made by a single edged blade in excess, of four inches in length and that very probably more than one knife was used in stabbing the deceased.
Sheriff J. C. Carr was then recalled by the State for purposes of identifying clothing worn by the deceased at the time of his death. This concluded the State’s case in chief. Defense counsel moved to exclude the evidence alleging that the State had not “established the burden of linking [appellants] with Dennis Bynum.” This motion was denied. At this time the appellants presented their defense.
Roger Beam testified that he was a Deputy and Investigator for the Blount County Sheriff’s Department. On August 17, 1976, Beam was assigned to the Bynum case. At that time he was informed that appellants were suspects in the case. In the course of his investigation, Beam stated, he talked with Mike Alexander, the manager of Fifty Minute Cleaners in Birmingham, Alabama. Alexander told Beam that Sammie Lee Jones had worked at the cleaners. However, he was not positive Sammie Lee had worked on March 24, 1976. Alexander stated that Sammie Lee might have been working for J. J. Vinson, Alexander’s father-in-law.
Beam later talked with J. J. Vinson. Vinson told Beam that Sammie Lee was working for him on March 24, 1976, he thought.
Beam further testified that he had the numbers of the car tag which Bynum had given Doris Long and Sheriff Carr and ran a check through a computer. He found a tag numbered 1-C 47162 registered to Julian Jones who was the alleged father of the appellants. No car with this license plate was ever found. He did not find a car belonging to either of the appellants. Beam further testified that Sammie Lee’s driver’s license was suspended on May 6, 1976.
J. J. Vinson testified that he owned Comet T.V. in Birmingham. He stated that Sammie Lee worked for him on March 24, 1976. Vinson’s wife also testified that Sammie Lee was working for her husband on March 24, 1976.
Mike Alexander testified that he managed Fifty Minute Cleaners in Birmingham, Alabama. He stated that he saw Sammie Lee Jones on March 24, 1976 at Comet T.V., at about nine o’clock that morning.
Gordon Burns testified that he owned Alabama Wholesale Company and that he subleased office space from J. J. Vinson. Burns stated that he saw Sammie Lee Jones working for J. J. Vinson on March 24, 1976, between 9:00 a. m. and twelve noon.
In rebuttal, Cletus Atkins testified that he worked at Comet T.V. for J. J. Vinson. He stated that Sammie Lee Jones did not work for Vinson before March 27, 1976.
Aubrey Classcock, an Investigator for the Blount County Sheriff’s Department, testified that Mike Alexander had told him he was not positive if Sammie Lee had worked for Vinson on March 24, 1976. Further, Glasscock stated that he had interviewed appellant Jimmie Lee Jones who told him he was working at Dixie Sprinkler Company on March 24, 1976. Glasscock contacted that company and discovered that, though Jimmie Lee worked at that business, he did not work March 24, 25, or 26, 1976.
Nina Mitchell, Office Manager for Dixie Sprinkler Company, testified that Jimmie Lee Jones was an employee of the company and that he did not work on March 24, 25, or 26, 1976. This concluded the evidence in this case.
In addition to moving to exclude the State’s evidence at the close of the case in chief, appellants also raised the sufficiency of the evidence in a motion for new trial. Arguments were made by counsel. However, no testimony was taken. This motion, *734 including several other matters other than sufficiency of the evidence, was denied.
The evidence in this case is in sharp conflict. The State’s evidence places appellants at the scene of the crime. The appellants set forth an alibi defense.
It is well established that conflicting evidence always presents a question for the jury as to the guilt of the defendant unless the evidence palpably fails to make out a prima facie case. Lee v. State, Ala.Cr.App., 346 So.2d 31. A verdict rendered on such evidence is conclusive on appeal. Young v. State, Ala.Cr.App., 346 So.2d 509. Nor does alibi evidence present an exception to this general rule. Smith v. State, Ala.Cr.App., 346 So.2d 500; Freeman v. State, Ala.Cr. App., 350 So.2d 768.
Where there is legal evidence from which the jury can by fair inference find the defendant guilty, the Court of Criminal Appeals has no right to disturb the verdict. Whether there is such evidence is a question of law, its weight and probative value are for the jury. Woods v. State, Ala.Cr.App., 344 So.2d 1225; Williams v. State, Ala.Cr.App., 348 So.2d 1142. Here the evidence was more than sufficient for the jury to determine that appellants brutally murdered Dennis Bynum.
Appellants next contend that they were denied due process as a result of the State suppressing evidence favorable to them. Appellants rely on Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215.
On October 19, 1976 appellants filed a Motion for Inspection and Discovery, a veritable scattergun, running five legal pages in length. One of the items requested by appellants was an “original sketch drawn by a witness named Duke as a representation of an individual he saw in a car in Blount County on the 24th day of March, 1976.” Duke did in fact draw such a sketch, and it was produced at time of trial. However, appellants allege that the District Attorney of Blount County and a Blount County Sheriff’s Deputy denied that such a sketch existed. This allegation does not have the support of any testimony in the record.
Trial of appellants commenced on October 25, 1976. During opening statement, counsel for appellants stated that it would be shown during the trial that appellants did not own a car and did not possess drivers’ licenses. Defense witness Roger Beam testified that Sammie Lee Jones’s driver’s license had been revoked. Counsel for appellants then moved that the State produce any record of conviction resulting in revocation of Sammie Lee’s license. The State complied with appellants’ request.
From the record:
“MR. BURTTRAM: Let the record show that, in open court, I’m handing counsel for the defense, for his inspection, a memo taken from N.C.I.C. showing that the subject in question — Sammie Jones’s —driver’s license was suspended January the 18th, 1975, for failing to appear in Court. I just handed him the memo.
“THE COURT: All right.
“MR. SUTTON: May the record just simply conclude on this point by saying that my motion was to produce a certified copy of the docket showing the conviction resulting in the suspension or revocation.
“THE COURT: Well, all right. It looks likq they have done the best they can in the limited time.
MR. BURTTRAM: Also, Your Honor, at this time I’d like for the record to show that counsel for the defense entered this himself into evidence — the question of his driver’s license. And what I just furnished him is a reply to his request.
“THE COURT: All right. It looks like they’ve complied the best they can, Mr. Sutton, on such short notice.
“MR. SUTTON: Thank you.”
Appellant now urges that, near the close of the trial, counsel was informed that Sammie Lee Jones never had an Alabama driver’s license and that an N.C.I.C. printout showed that his privilege to have a license had been suspended. Appellants raised this point on motion for new trial. However, no testimony was presented, only the bare assertions made by counsel.
*735 Appellants complain that the testimony of Thomas Eugene Brown was a complete surprise and that the State did not comply with the October 19, 1976 motion to produce by failing to produce the statement of Thomas Eugene Brown. The record shows that Thomas Eugene Brown did not contact any law enforcement officer until two days before the trial commenced. He did not discuss his testimony with the District Attorney prior to the time he took the witness stand.
Brady, supra, is inapplicable to this case. All of the information sought by appellants was made available at trial. The testimony of Thomas Eugene Brown was not exculpatory or favorable to either appellant. It cannot be said that appellants have been denied due process where there has been no showing that any evidence was suppressed by the State. Guy v. State, 48 Ala.App. 293, 264 So.2d 214; Johnson v. State, Ala.Cr.App., 335 So.2d 663, cert. denied, Ala., 335 So.2d 678.
Appellants finally urge that their case is due to be reversed as a result of improper questions asked of two defense witnesses on cross-examination. The District Attorney asked J. J. Vinson if Sammie Lee Jones stole television sets for him. Counsel objected and the question, unanswered, was excluded. The District Attorney also asked Vinson’s wife if her husband fenced stolen merchandise. This question was also stricken upon objection by counsel. This question was never answered.
Nothing is presented for review as there was no adverse ruling. Stinson v. State, 56 Ala.App. 312, 321 So.2d 277. Secondly, improper questions which are not answered are deemed to be harmless. Woods v. State, Ala.Cr.App., 344 So.2d 1225.
A thorough search of the record reflects no error injuriously affecting the substantial rights of appellants. The judgment of conviction as to each appellant is affirmed.
AFFIRMED.
All the Judges concur.