320 So.2d 89

**John Ellington SIMMS**

v.

**STATE.**

**4 Div. 313.**

Court of Criminal Appeals of Alabama.

Oct. 1, 1975.

J. Huntley Johnson, Dothan, for appellant.

William J. Baxley, Atty. Gen., and Sarah M. Greenhaw, Asst. Atty. Gen., for the State, appellee.

HARRIS, Judge.

Appellant was convicted of robbery and sentenced to twenty years in the penitentia-ry. At arraignment, attended by counsel, he pleaded not guilty. After conviction he was found to be indigent and a free transcript was furnished him, and trial counsel represents him on this appeal by appointment of the court.

The victim of this alleged robbery was Mr. Lon Wright who lived three miles east of Cottonwood, Houston County, Alabama, on Highway 53, leading from Dothan to Malone and Marianna, Florida. On the day of the robbery the victim was a seventy-five year old retired man and lived with his brother in a five room house.

On April 30, 1974, two white men came to Mr. Wright's home around 8:00 o'clock a. m. He was alone at the time. His brother had gone to have some work done on his car. The men were subsequently identified as appellant and one Ollie Maguire. They asked Mr. Wright if he had any moonshine whiskey and he told them he didn't mess with it. The men left and returned in about thirty minutes. They walked in the house and found Mr. Wright in the kitchen. Maguire pulled a pistol on him and said, "Let's go," and they carried Mr. Wright into his brother's room. Maguire held the pistol on Mr. Wright and told him to put both of his hands on top of his head and told appellant to search him. They took his billfold out of his pocket and spread the money out on the bed and according to Mr. Wright there was between $143.00 and $150.00. They took the money and the billfold. Maguire then snatched the phone out and carried Mr. Wright into the living room. They made him lie on the floor with his arms behind him and Maguire told appellant to tape his arms and legs. Appellant went to the car and returned with some tape and taped Mr. Wright's hands and legs while Maguire held the pistol on him. After he was securely bound, Maguire told him if he called the law, he was going to come back and kill him. They walked out of the house and Mr. Wright heard the car leaving.

After the robbers left, Mr. Wright got off the floor and went out front to try and

stop someone to call the officers and tell them he had been robbed. He stopped a man from Malone, Florida, who reported the robbery to Officer Don Smith who in turn called the Sheriff's Department. Officer Don Smith and Deputy Sheriff Hunter came to Mr. Wright's home to investigate the robbery.

Mr. Wright gave the Deputy a description of the men who robbed him and he knew one of the men as he had been to his house before. He could not recall his first name but his last name was Simms. He said Simms had long hair way down to his shoulders and had a mustache. He was not certain as to the car they were driving but thought it was a Pontiac and was black. He made a positive in-court identification of appellant as one of the men who robbed him on the morning of April 30, 1974. He further testified that both appellant and his wife had been to his house prior to the date of the robbery.

On cross-examination he admitted that on June 3, 1968, he was convicted for violating the prohibition law but that he quit bootlegging after that conviction. He further stated that his brother was the bootlegger.

From the record:

"Q  Mr. Wright, let me ask you something now. Is there any mistake in your mind that the man that came there and robbed you is this young man?

A  That's him right there.

Q  There's no doubt whatsoever?

A  No, sir, no doubt.

Q  You have seen him how many times before?

A  I had never counted them.

Q  Would you say you seen him more than one time?

A  Well, it had to be.

Q  Are you sure about it?

A  I know him.

Q  But you didn't know his name until somebody told you, is that right?

A  I didn't know his first name, but I knowed his last name."

Mr. Donnie Smith, Chief of Police of Cottonwood, testified for the state. He stated that he was on duty on April 30, 1974, when a Mr. Everrett Pelham of Malone, Florida, contacted him and reported that Mr. Lon Wright had been robbed. He followed Mr. Pelham back to Mr. Wright's house and found him sitting on his front porch with his hands bandaged up and he told the Chief he had been robbed.

The Chief further testified that Mr. Wright called him later and told him that he knew one of the men who had robbed him and that he was "Tink" Jacob's son-in-law. The Chief knew Jacob's son-in-law to be John Simms and he had known him a year or two. He stated that about a month before April 30, 1974, he saw him at a family reunion dinner given by Simms' sister-in-law and on that occasion he had long hair and wore a mustache. The hair was shoulder length. He made an in-court identification of appellant as John Simms.

Deputy Sheriff Buddy Hunter testified that he worked as an investigator for the Sheriff of Houston County. He stated he investigated the robbery of Mr. Wright and got a description of the two men involved. Mr. Wright told him one of the men was about six feet tall, weighed about 170–180 pounds, had shoulder-length dark hair and a mustache. That he was wearing blue clothes, with writing on the left shirt pocket. That Mr. Wright told him the other robber was about five-six or five-eight inches tall, and weighed about 140 to 150 pounds, and that he had blond hair and it was a regular hair cut. That he was wearing gray pants with a white shirt with brown stripes in it.

Mr. Hunter further testified that the next time he saw John Simms was on May

6, 1974, in the Marianna County Jail. Simms waived extradition and was brought to the Houston County Jail where the jailer took his picture. Mr. Hunter identified this photograph as a picture of John Ellington Simms and it was received in evidence without objection.

On cross-examination Mr. Hunter stated that appellant told him he came to Dothan on the morning of April 30, 1974, in an automobile with Ollie Maguire to see if they could find jobs. He claimed they went to a number of places seeking jobs, viz., Atlas Truck Line; Sunnyland Packing Company; Allied Truck Lines; Metcalf and Shivers; Swift and Company; R. C. Cola Bottling Company; and Couch Construction Company. He stated he checked out these places to see if Simms or Maguire had been there and was told they did not remember.

On re-direct examination Mr. Hunter stated he gave Simms his Constitutional rights before asking him any questions by reading him his rights from a *Miranda* card. Simms told Mr. Hunter that he had been working with law enforcement and he understood his rights.

From the record:

"A Then I read them to him: 'You have the right to remain silent; anything you say can and will be used against you in a court of law. You have the right to talk to a lawyer and have him present with you while you are being questioned. If you cannot afford to hire a lawyer, one will be appointed to represent you before any questioning if you wish. You can decide at any time to exercise these rights and not answer any questions or make any statement. Do you understand each of these rights I have explained to you?' He answered, 'Yes.' 'Having these rights in mind, do you wish to talk to us now?' His answer was 'Yes.'

Q All right, did he sign anything at that time?

A Yes, sir. I read the waiver to him: 'I have read or had read to me this statement of my rights and I understand what my rights are. I am willing to make a statement and answer questions. I do not want a lawyer at this time; I understand and know what I am doing. No promise, or threats have been made to me and no pressure of any kind has been used against me to get me to make a statement.' This he signed.

Q At that time, did you offer him any reward to get him to make a statement?

A No, sir.

Q Did you promise him anything?

A No, sir.

Q Did you offer him any other inducement to get him to make a statement?

A No, sir.

Q Did he make a voluntary statement at that time?

A Yes, sir.

Q Do you have the statement there?

A Yes, sir.

Q Did you reduce the statement to writing?

A Yes, sir, I did.

Q Did he sign it?

A Yes, sir.

Q Is the one typed been compared by you and is a true and correct copy of the one he signed?

A Yes, sir.

MR. MARTIN: I offer State's Exhibit Two, consisting of two pages, in evidence.

THE COURT: Do you have any objection to the statement being admitted?

MR. JOHNSON: No, sir."

When Mr. Hunter first interviewed appellant, he denied that he was involved in the robbery of Mr. Wright and he offered to take a lie detector test. This was on May 9, 1974, but the operator of the Polygraph machine could not be located that day. He located the operator the next day or the day after and Simms told him that his attorney advised him not to take the lie detector test.

Appellant offered the testimony of Johnny McDaniel, a Captain with the Jackson County Sheriff's Department from Marianna, Florida. He stated that he had known Simms all of his life and he worked for him as an undercover agent in making drug buys. He said that in working narcotics and working the streets, such as Simms was doing, he has to wear his hair long, in the fashion of a hippie-type individual, and hang out at places where drug users would go. He further stated that Simms worked in this capacity from February 27th until April 20th of 1974, and his job was terminated on April 20, 1974, because he went to a local tavern and got drunk and there was a disturbance.

Appellant testified in his behalf and denied any connection with the robbery of Mr. Wright. He admitted coming to Dothan on the morning of April 30, 1974, with Ollie Maguire in search of employment. He said he went to the places mentioned above but they were not hiring people at the time; that he got back home about eleven-thirty, ate lunch and went fishing with members' of his family and fished the rest of the day. He admitted he knew where Mr. Wright lived and passed by his home on the way to Dothan on April 30, 1974.

On cross-examination he testified that he weighed 183 pounds and was six feet one inch tall. He said Maguire was over five feet tall, but under six feet and was shorter than he. He could not remember how Maguire was dressed that day. He was asked about the trouble he got involved in at the tavern and said, "A lady approached me as a prostitute and asked me did I want to go to a party that night." He went to this woman's house and got into an argument with someone there and the woman called the officers. That he was arrested but the case was later nolle prossed.

On re-direct examination he testified that prior to April 30, 1974, he and the girl he was dating went to Mr. Wright's house to buy a bottle of whiskey but he didn't actually meet Mr. Wright at that time. The girl, whom he later married, bought the whiskey.

Appellant offered two witnesses who testified they knew his reputation in the community for truth and veracity and that it was good.

There was no motion to exclude the state's evidence; there was no request for the affirmative charge, and no exceptions were reserved to the court's oral charge to the jury.

There was a motion for a new trial and a hearing was held on October 7, 1974, before the trial judge. Much testimony was adduced at this hearing. The main thrust of the testimony was that before the jury was struck, the wife of appellant claimed to have seen the prosecuting witness talking to a member of the jury panel. She did not hear any of the conversation and was unable to identify the juror. Mrs. Simms testified she told her husband's attorney what she had seen and he asked her to try and locate the juror. She looked in the court room but was unable to identify him. She claimed she saw the juror on the trial jury during the closing arguments of the lawyers. It was never brought to the court's attention that a juror was seen talking to the prosecuting witness. At the conclusion of the hearing the trial court overruled and denied the motion for a new trial.

We think it not amiss to set forth the judgment on the motion for a new trial.

"JUDGMENT ON MOTION FOR NEW TRIAL

Defendant moved this Court for a New Trial of his case and in support thereof offered orally before the Court on October 7, 1974, the testimony of three witnesses, one being the sister-in-law, who is a convicted felon presently on probation in this Court. The deposition of a fourth, being a Mr. John Pelham, was offered by the Defendant. The witnesses, Mrs. McGuire (wife of co-defendant) and Mr. Pelham were known to the Defendant prior to his trial. Their names were mentioned throughout the trial of the case by various witnesses. These witnesses did not testify to anything at the motion for a new trial which was unknown to the Defendant at the time of his trial, and in the opinion of this Court, their testimony would not add anything to the testimony given by Defendant's witnesses who testified during the course of the trial. Further, from aught that appears to this Court these two witnesses could have been present at the trial if the Defendant and his attorney had made a diligent effort to have them there.

The wife of the Defendant, Mrs. John Simms, on the motion for a new trial, testified that prior to the time that the jury was qualified and selected in her husband's case that she saw a member of the jury venire talking to the victim and prosecuting witness in this case, Mr. Lon Wright, on another floor of the Court House. She testified that she made this known to the Defendant's Attorney prior to the qualification and striking of the jury in this case and that the Defendant's attorney asked her to come into the court room and point this juror out to him while the jurors were being qualified. The jurors were brought in panels of 15–18 before the bench and questioned carefully about any knowledge they might have about the case; any interest by blood or marriage to the victim; any

opinion they might have as to the guilt or innocence of the defendant; any promise that they might have made to convict or acquit Defendant; as well as other qualifying questions. Mrs. Simms testified that at no time while the jurors were being qualified or the jury stricken was she able to recognize or identify the juror she said she saw talking to the prosecuting witness earlier in the morning on another floor of the courthouse. Mrs. Simms testified that after the jury came back with a verdict of guilty against her husband that she realized that the juror she had seen talking to the prosecuting witness was on her husband's case. Mrs. Simms did not hear anything that was said between the juror and the prosecuting witness. There is no evidence that the juror, who Mrs. Simms testified she saw talking to the prosecuting witness, discussed the case at all with the prosecuting juror and the prosecuting witness took place prior to the qualifying and selection of the body and instructed repeatedly not to discuss the case among themselves until it was submitted to them for a verdict; not to discuss the case with anyone else and to report to the Court immediately if anyone approached either of them and attempted to discuss the case with them. There is no evidence that any juror talked to the prosecuting witness at any time after the jury was selected.

The witness, Hettie Mae Carraway, the sister-in-law of the Defendant, who is a convicted felon and is presently on probation in this Court, testified on motion for new trial that she talked to a juror, Mr. William Madison, who was a member of the jury which convicted the Defendant, several days after the trial. Mrs. Carraway testified that Mr. Madison made the statement to her that 'the Defendant could be identified by a mole on his face'. Defendant points out that there was no testimony to this effect elicited during the course of the trial. Mrs. Carraway did not testify whether

or not Mr. Madison told her that he or any other juror considered this in arriving at the verdict in this case. She did not testify, if she even knew, when Mr. Madison acquired this information. From aught that appears to this Court Mr. Madison could have acquired such information after the jury returned its verdict and was discharged in this case. The Court feels that Mrs. Carraway's credibility, at best, is questionable and that her sketchy testimony should not serve to impeach the verdict in this case. For the reasons appearing heretofore in this judgment, the Court is of the opinion that the Defendant's motion for a new trial should be, and the same is hereby, denied. The Clerk is directed to notify the attorney for Defendant and the District Attorney of the Twentieth Judicial Circuit of Alabama of this order.

This the 15th day of October, 1974.

/S/ Jerry M. White

Judge, Twentieth Judicial Circuit of Alabama"

■■ In reviewing the refusal of a motion for a new trial this court will indulge every presumption in favor of the correctness of the rulings of the trial judge and the decision thereon rests largely within the sound discretion of the trial court. *Heath v. State,* 30 Ala.App. 416, 7 So.2d 579; *Espey v. State,* 270 Ala. 669, 120 So. 2d 904; *Page v. State,* 41 Ala.App. 153, 130 So.2d 220; *Moore v. State,* 52 Ala. App. 179, 290 So.2d 246.

■ The testimony of appellant and Mr. Wright was in sharp conflict. We have repeatedly held that conflicting evidence always presents a question for the jury as to the guilt of the defendant unless the evidence palpably fails to make out a prima facie case. *Morris v. State,* 47 Ala.App. 132, 251 So.2d 629; *Irons v. State,* 42 Ala. App. 349, 165 So.2d 125; *Bradford v. State,* 35 Ala.App. 407, 47 So.2d 599;

*Jones v. State,* 54 Ala.App. 251, 307 So.2d 59.

■ Alibi evidence is an issue to be determined by the jury. *Price v. State,* 53 Ala.App. 465, 301 So.2d 230.

■ Where there is legal evidence from which the jury can by fair inference find the defendant guilty, this court has no right to disturb the verdict. Whether there is such evidence is a question of law, its weight and probative value is for the jury. *Haggler v. State,* 49 Ala.App. 259, 270 So.2d 690; *Price v. State,* supra.

In *Willcutt v. State,* 284 Ala. 547, 226 So.2d 328, the Supreme Court said:

"The scintilla rule does not apply in criminal cases. There must be substantial evidence tending to prove all the elements of the charge. *Ex parte Grimmett,* 228 Ala. 1, 152 So. 263. The burden is on the State to prove beyond a reasonable doubt that the crime has been committed and that the defendant was the person who committed it. *Jarrell v. State,* 251 Ala. 50, 36 So.2d 336. The weight of the evidence, the credibility of the witnesses, and inferences to be drawn from the evidence, where susceptible of more than one rational conclusion, are for the jury alone. *Byrd v. State,* 213 Ala. 333, 104 So. 830.

We cannot say in the instant case that there was not enough evidence to allow the jury to draw the inference that the defendant was the person who committed this robbery. The defendant presented a strong case in support of his alibi. The testimony of his witnesses was in direct conflict with the testimony of the State's witness. Yet the State's witness made a positive identification of defendant as the person who robbed and burned him. The State presented substantial evidence and the jury had before it an adequate basis for drawing inferences and conclusions against the defendant. It is for the jury, not the trial court or this court,

to find the facts and to determine guilt or innocence. The State presented sufficient evidence upon which the jury could base its verdict."

 The prosecuting witness was impeached by court records showing he had been convicted of more crimes than violating the prohibition law. This involved his credibility as a witness but it was the duty of the court to leave the question of his credibility to the jury. *Brown v. State,* 20 Ala.App. 178, 101 So. 224; *Gladden v. State,* 23 Ala.App. 416, 125 So. 398; *York v. State,* 21 Ala.App. 155, 106 So. 797.

We find no reversible error in the record and the judgment of conviction is affirmed.

Affirmed.

All the Judges concur.