The appellant, Jack Jay Herriman II, was charged with the capital offense of intentional murder committed during the course of a robbery. He requested youthful offender treatment, which was denied. The appellant was found guilty and sentenced to life imprisonment without parole pursuant to the recommendation made by the jury and subsequently agreed to by the trial court.
The appellant made a statement concerning his involvement in the offense at hand to Chief Deputy Nicholson, which was reduced to writing, read by the appellant, and signed on each page by the appellant. Although the appellant challenged the admissibility of this statement, we will now quote from it in order to relate the facts of this case and the issue of the statement's admissibility will be subsequently addressed:
 "After having the above rights fully explained to me and having understood these rights, I do hereby before and during the making of this statement knowingly, intelligently, and voluntarily waive and give up said rights and I did hereby make the following voluntary statement without any compulsion or persuasion of any kind being used on me, and for the sole and only reason that the facts stated are true, vis: My name is Jack J. Herriman, II. I am nineteen years of age. I was born in Flint, Michigan. . . .
 "On March 16, 1983, Rodney Connolly and I left Michigan. . . .
 ". . . Rod got into my car. We drove and talked. He told me that he would *Page 355 
give me fifty dollars and pay for me to take him to the Ohio State Line. And I agreed.
 ". . . He offered for me to come down with him to Alabama and he said we could get a job because Kevin Charaneice [phonetic] was working for his uncle at Pizza Inn.
 "We got to Alabama and stayed at Kevin's apartment, which was about March 17, 1983. We stayed there until April 4 or 5. That was when we got evicted. Rod's girlfriend, Kathy Sands, needed some help to move as she was moving from a location with some friends to a place by herself. Rod and I helped her move. For helping her move, she let us stay there for about April 6th or 7th. She did not say how long we could stay there.
 "While we were staying there, she got Rod a job, Buccaneer Yacht Club, bartending on weekends, which he made about $70 a week. Everything was all right for the first couple of weeks.
 "She started pushing me to get a job. I put in one application at Pizza Inn. I was going through the paper and saw ads for Crewship and I called. . . .
 "A few days later, about Sunday or Monday, me and Kathy really started to fight. That went on until about Tuesday when me and Rod left for a couple of days. While we at [sic] Kathy's, Rod had another girlfriend that he was seeing. Her name is Stacy Marie Bruner. While we were staying with Kathy, Rod had led Kathy to believe that Stacy was my girlfriend and had led Stacy to believe that Kathy was my girlfriend.
 "The first night we were gone, me and Rod and Stacy went to the Buccaneer Yacht Club where Rod had all the keys to it. We stayed there and drank. Rod was drinking Cognac and I was drinking Wild Turkey and Coke. Stacy drank Long Island Tea. We stayed the night there.
 "When we woke up, we changed — cleaned everything up and left. As we were leaving, Rod was locking the door and the alarm went off. From there we took a bottle of Cognac, Barcelona Rum, Seagram's V/O, a plastic license plate with Buccaneer Yacht Club on it. We took four or five styrofoam bottle coolers and a Michelob tapper.
". . .
 ". . . Rod told me to wait at Kathy's apartment and he would be at Stacy's house.
 "I was in the apartment when Kathy came home for lunch. She asked me where Rod was. I told her I did not know. She took a shower. She came out of the shower and started fighting with me. She slapped me and I really got mad. I grabbed her nightgown, put it around her neck and strangled her.
 "After that, I called Rod on the phone and told him to come on over there. After I hung up the phone with Rod, I took a shower. After I got out of the shower, Rod came over and we moved her into the bathtub and put a towel up over her face, shut the door. We went through her purse. She had ten, eleven dollars in her purse. Rod took that, her Advantage card, and the keys to her car.
 "We met Stacy at the lake at the end of Old Government Street where we drank the Seagram's. When we were drinking the Seagram's, two guys came walking up to us. One [sic] name was Stacy and the other guy was Paul. We talked for a while. After we left there [sic], to an Advantage [automatic teller] place and Stacy punched the buttons and got $40.
 "Immediately after that, she put the card in again, pushed some more buttons and got another hundred dollars. . . .
". . .
 ". . . That night Rod said I should go back to Kathy's apartment and grab her TV and adding machine. We had taken her gold watch when we took the things from her purse. I went back alone, went into the apartment, turned on the fan in the bathroom, took the TV and adding machine, went back to Solomon's where Rod was waiting for me.
". . . *Page 356 
 ". . . The next morning Rod and I got washed up in the lake. We left there. We tried to use the Advantage Card, but it wouldn't work. So, we went to Abel Pawn Shop where I pawned her TV and got Rod's watch out of pawn. We went to several Advantage places and none worked. Then we went to First Federal Gold and Silver Exchange where Stacy sold the gold watch for a hundred and one dollars. I sold the adding machine there for ten. We went to Stacy's house where she took a shower. We then went to another Advantage place and it didn't work. Stacy dropped Rod and me at Municipal Park. She went home, changed clothes for work. She came back to pick us up. She said they had found Kathy and it was on the TV news.
 "We went to the Advantage place at Airport Boulevard and Cottage Hill where we tried Fast Cash and got $25. We then went to Solomon's to take Stacy to work. Rod and I went back to Kathy's car where I got out Rod's black leather jacket and two shirts that were in it.
 "We went back to Solomon's where Rod suggested to Stacy that Rod and I take Stacy's car and leave. So then she said okay. And I went to Gaylord's Department Store and had a spare key made. I went back to Solomon's. Rod and I drank a pitcher of beer and left.
 "We then got on the freeway and went west. Just outside of Mobile, we saw two hitchhikers and picked them up. They were the same two that were picked up with us by Texas Highway Patrol officers.
". . .
 ". . . I am really so sorry that I did it and wish that I could go back and change it. But I can't since I have been apprehended. I have asked the Lord for forgiveness. [sic] and I hope that he will forgive me.
 "This statement is being made by me to Charles Nicholson and Bill Madding of the Freestone County Sheriffs Department. This statement is of my own free will and without threats and/or promises. I am not on drugs and have not had any alcoholic beverages in the past four days. I am of sound mind and realize what can happen as a result of this statement."
The appellant, Rod, and the two hitchhikers were arrested by the Texas authorities for speeding, whereupon it was learned that the appellant was being sought by Alabama officials in connection with this case.
At trial, Stacy Bruner testified that on the afternoon following the murder the appellant had described how he had killed Kathy. She testified that he stated that he waited for Kathy to come home from work and that she was not going to go back to work that afternoon. He told Stacy that when Kathy came out of the shower, he was waiting behind the bathroom door and strangled her with her nightgown. She testified that he further stated that it took about twenty minutes to kill Kathy and that, at first, she thought what he was telling her was a joke. She further testified that the appellant "made a comment to the effect that the stupid bitch deserved it."
 I.
The appellant argues that the trial court erred in failing to order a preliminary hearing, as provided for under § 15-11-1,Code of Alabama (1975). However, the appellant was indicted prior to the preliminary hearing. The appellant alleges that the timing of the indictment infringed upon his rights by causing his preliminary hearing request to be denied and thereby obstructing his avenues to discovery.
 "It so happens that at such a preliminary hearing a defendant obtains some information, and sometimes tremendously valuable information, as to evidence that is likely to be presented against him on the trial of his case. This, however, is merely a legitimate by-product of the process that is not embraced within the policy providing for it. A preliminary hearing is not a prerequisite to a valid indictment. . . . Neither a preliminary hearing nor a failure to conduct a preliminary *Page 357 
hearing impairs an indictment; nor does either substantially affect the course of a prosecution based upon an indictment."
Daniels v. State, 335 So.2d 412, 414 (Ala.Cr.App. 1976).
"Constitutionally, a preliminary hearing is not necessary to satisfy the requisites of due process." Duncan v. State,369 So.2d 885, 887 (Ala.Cr.App. 1979). Although § 15-11-1, Code ofAlabama (1975), establishes the right to a preliminary hearing where it is demanded within 30 days following the arrest, where an indictment is returned prior to the hearing, the accused is no longer entitled to the preliminary hearing.
 "If the accused makes such a demand within thirty days of his arrest, the preliminary hearing must be held within a reasonable time following his demand; however, based on Duncan and the persuasive authority of Rule 5.1(a)(4) of the Proposed Alabama Rules of Criminal Procedure, if an indictment is returned against the accused within that reasonable time, charging the same offense, the accused is no longer entitled to a preliminary hearing. This construction of Section 15-11-1 recognizes fully the legislative intent that an accused be given an inquiry into probable cause within a reasonable time of his arrest. . . . This construction comports exactly with the directions in Proposed Rule 5.1(a)(4) and is in harmony with the principles negating any constitutional requirement in Alabama that there be two inquiries into probable cause. Duncan, 369 So.2d at 887."
Nobis v. State, 401 So.2d 191, 195 (Ala.Cr.App.), cert. denied,401 So.2d 204 (Ala. 1981).
 II.
The appellant argues that the trial court erred in denying his request to be treated as a youthful offender. Specifically, the appellant claims that the report made by the State Parole and Probation Department shows no offenses or "reputation flaws" other than those arising out of the incident at hand. However, as the State points out, the report also contains information that the appellant was dishonorably discharged from the United States Navy after one year and seven months of service because he was absent without leave from his vessel. Furthermore, the report contains the information regarding the robbery committed at the Buccaneer Yacht Club and information from a "reputation report" which revealed that the appellant "used Marijuana and Hashhish as long as he had it." The reputation report also indicated that the appellant "talked about 'getting back at people who had screwed them over' " and that the appellant was "out to get in trouble."
The record also shows that a hearing was held concerning the request for youthful offender status and the order denying the motion stated that the court's decision was based on a consideration of "the totality of the Youthful Offender investigation, as well as of the nature of the offense charged." "Here, it does not affirmatively appear that the decision of the trial judge was arbitrary or made without some examination or investigation. The record provides no basis for overturning the denial of the defendant's request for youthful offender status. Carthon v. State, 419 So.2d 293, 295
(Ala.Cr.App. 1982)." Garrett v. State, 440 So.2d 1151, 1153
(Ala.Cr.App. 1983).
 III.
The appellant contends that the trial court erred in denying his motion to suppress his confession because it was obtained after he had asserted the right to have counsel present. The facts surrounding the appellant's statements were conflicting at trial. Deputy Madding, of the Freestone County Sheriff's Department, testified that he spoke to the appellant twice on June 14. He testified that his contact with the appellant was initiated by the jailer, who came to Madding's office and informed him that the appellant wished to speak to him. Deputy Madding testified that when he first entered the booking area, the appellant "said 'hi' ", to which *Page 358 
Madding returned "hi." Thereafter, Madding testified that the appellant "then said he'd like to talk to me about something. I said okay. I asked him to come on back to the office. And when he was walking down the hall, he started talking to me in reference to a case which I'm here today." Madding testified that when they arrived in his office, he read the appellant his rights from a form. He then asked the appellant if he understood the rights and the appellant indicated that he did. Madding testified that he then had an oral discussion with the appellant for approximately ten minutes. The discussion ended when the appellant stated "that he thought he might better just stop right now." Madding then stated "that would be fine" and took him back to the booking area of the jail. He testified that the appellant did not make any request for an attorney at that time.
During the oral discussion, the appellant had admitted to the strangling of the victim. Madding further testified that later that same day, he was contacted by Chief Deputy Charles Nicholson, who informed him that the appellant wanted to talk again. When Madding got the appellant out of his cell, the appellant advised him that he wished to talk. He and Chief Deputy Charles Nicholson read the appellant his rights again, whereupon the appellant said that he would like to give a statement. "We then advised him he did not have to give any statement. He advised that he wanted to." Although Deputy Madding testified during the suppression hearing, he did not testify at trial.
Chief Deputy Nicholson testified that the jailer, Roberte Ramos, advised him that the appellant would like to speak to him. The appellant then advised Chief Deputy Nicholson that he needed to talk to someone; however, he did not want to talk to anyone "in the presence of any officers from Mobile, Alabama." Chief Deputy Nicholson testified that the appellant was the first person to speak. When Chief Deputy Nicholson indicated that the appellant could talk to another officer or Nicholson, the appellant responded that he wished to think about it, saying "I've got a problem. I was involved in something." Chief Deputy Nicholson further testified that he responded "take your time." The appellant was then returned to his jail cell and, approximately 20 to 30 minutes later, Chief Deputy Nicholson was again advised that the appellant wanted to speak to him. Chief Deputy Nicholson testified that Deputy Madding and he subsequently had the appellant brought to the booking area and that the appellant was the first person to speak. Chief Deputy Nicholson's testimony concerning the circumstances around the appellant's statement is as follows:
 "He [the appellant] said that he needed to go ahead and give a statement of what he had done in Mobile, Alabama. I said, What have you done in Mobile? He said, Well, I strangled a girl. And at this point, he started crying, talking incoherent. I tried to calm him down, give him a Coke, give him cigarettes and got him to calm down. Advised him of his rights by the Miranda warning and asked him to go ahead and write out a statement, at which time he advised that he could not write very good and asked if I could write the statement for him."
Chief Deputy Nicholson testified that the appellant never asked for an attorney and, after the statement was written out, the appellant read the statement and signed each page. The statement further showed that the appellant made corrections and initialed them. He thereafter acknowledged that the statement was correct. Chief Deputy Nicholson testified that neither he nor anyone in his presence threatened the appellant in any manner in order to induce him to give a statement. He testified that the appellant appeared to understand what was happening and was coherent.
Although the second written statement was admitted into evidence, no evidence of the initial oral statement was presented to the jury.
The record indicates that on the day before the appellant made his statements, he had stated, "I'd rather get a lawyer," when asked if he wished to make a statement. This request for counsel was made to the *Page 359 
Mobile District Attorney and Mobile Detective Wilbur Williams. Williams testified that no further effort was made to interrogate the appellant; however, extradition was explained to him. The appellant argues that this request for counsel made the appellant's subsequent statement inadmissible. Further, the appellant's testimony during the suppression hearing clearly conflicts with the testimony of Chief Deputy Nicholson and Deputy Madding as to who initiated the conversation.
The appellant also testified that he was prompted to speak by the jailer, Deputy Robert Ramos. However, at trial, Deputy Ramos testified that he never prompted the appellant to speak, nor made any of the statements that the appellant said he had made. Ramos testified, however, that his memory was unclear as to the circumstances surrounding the appellant's request to speak to someone. He testified that the appellant "would have had to come to me about making or wanting to see an officer in the Sheriff's Office. . . . Best of my memory, he asked me to see someone, an officer, an investigative officer in that Department."
"[A]n accused . . . having expressed his desire to deal with the police only through counsel, is not subject to further interrogation by the authorities until counsel has been made available to him, unless the accused himself initiates furthercommunication, exchanges, or conversations with the police."Edwards v. Arizona, 451 U.S. 477, 484-85, 101 S.Ct. 1880, 1885,68 L.Ed.2d 378 (1981). (Emphasis added.) Thus, where a suspect is held in custody, he cannot be subjected to further interrogation after requesting an attorney, "unless the suspect himself initiated dialogue with the authorities." Wyrick v.Fields, 459 U.S. 42, 46, 103 S.Ct. 394, 395, 74 L.Ed.2d 214
(1982). However, "even if a conversation taking place after the accused has 'expressed his desire to deal with the police only through counsel,' is initiated by the accused, where reinterrogation follows, the burden remains upon the prosecution to show that subsequent events indicated a waiver of the Fifth Amendment right to have counsel present during the interrogation." Oregon v. Bradshaw, 462 U.S. 1039, 1044,103 S.Ct. 2830, 2834, 77 L.Ed.2d 405 (1983).
In the present case, the testimony of Chief Deputy Nicholson and Deputy Madding indicates that the appellant's initiating statements "evidenced a willingness and a desire for a generalized discussion about the investigation; it was not merely a necessary inquiry arising out of the incidents of the custodial relationship." Oregon v. Bradshaw, supra, at 1045-46,103 S.Ct. at 2835. Furthermore, "when a right so fundamental as that to counsel at trial is involved, the question of waiver must be determined on 'the particular facts and circumstances surrounding that case, including the background, experience, and conduct of the accused.' " North Carolina v. Butler,441 U.S. 369, 374-75, 99 S.Ct. 1755, 1758, 60 L.Ed.2d 286 (1979). In the present case, under the totality of the circumstances, " 'including the necessary fact that the accused, not the police, reopened the dialogue with the authorities,' " Oregon v.Bradshaw, supra, 462 U.S. at 1046, 103 S.Ct. at 2835, quotingEdwards v. Arizona, supra, 451 U.S. at 486, 101 S.Ct. at 1885, the appellant knowingly and intelligently waived his right to counsel.
Despite the fact that the appellant's testimony at the suppression hearing conflicts with that of Deputy Madding and Chief Deputy Nicholson, it is well established that the resolution of conflicting testimony and the credibility of witnesses is to be determined by the trial court and, absent a gross abuse of discretion, should not be reversed on appeal.Hamilton v. State, 492 So.2d 331 (Ala.Cr.App. 1986); Musgrovev. State, [Ms. 8 Div. 345, October 14, 1986] (Ala.Cr.App. 1986).
 IV.
The appellant argues that the trial court erred in allowing the State to use "false testimony" as a basis for key issues at trial. The record indicates that during the cross-examination of Stacy Bruner, she admitted that she had lied to the police in her two statements to them. Thus, she *Page 360 
was impeached and her credibility became a question for the jury. United States v. Justice, 431 F.2d 30 (5th Cir. 1970);Simms v. State, 56 Ala. App. 156, 320 So.2d 89 (Ala.Cr.App. 1975); Jones v. State, 23 Ala. App. 395, 126 So. 178 (1930);Gladden v. State, 23 Ala. App. 416, 125 So. 398 (1930); York v.State, 21 Ala. App. 155, 106 So. 797 (1925), cert. denied,214 Ala. 169, 106 So. 798 (1925).
Furthermore, the appellant bases his argument on cases indicating that "a conviction obtained by the knowing use of perjured testimony is fundamentally unfair, and must be set aside if there is any reasonable likelihood that the false testimony could have affected the judgment of the jury."United States v. Agurs, 427 U.S. 97, 103, 96 S.Ct. 2392, 2397,49 L.Ed.2d 342 (1976). See also the cases cited therein. However, there is no indication in the record of any "knowing use" of perjured testimony by the prosecution; nor does the appellant allege any facts to support his contention. Thus, this claim is meritless.
 V.
The appellant argues that his counsel was rendered ineffective by the trial court's "handling of the motion to suppress . . . by requiring counsel to make certain decisions about tactics without having all the facts before him." The appellant's argument is based on the fact that Deputy Ramos did not testify at the suppression hearing; rather he was the first witness to testify at trial. At the close of the suppression hearing, the trial court indicated that its judgment would be withheld until hearing the testimony of Deputy Ramos. The defense counsel thereafter objected, stating that the determination of whether or not the statement would be admitted "materially affects the manner in which we [the defense] may approach this trial." The trial court responded to this objection as follows:
"Approach it, Mr. Pennington, as if it [the statement] is in because I am allowing it in conditionally. If it later is suppressed, I will on your motion or the State's motion grant a motion for mistrial to try it over on the theory that it's not going to be in." Thus, the trial court settled any questions that the defense counsel had in proceeding without knowing whether the statement would be admitted. Further, as already decided, the statement was properly admitted into evidence.
Moreover, as to the appellant's claim of ineffectiveness of counsel, the appellant has failed to show the requisite prejudice under Strickland v. Washington, 466 U.S. 668,104 S.Ct. 2052, 80 L.Ed.2d 674 (1984).
AFFIRMED.
All the Judges concur.